ALLSTATE INSURANCE COMPANY, Plaintiff-Appellee, v. JEFFREY CA-RIOTO, Defendant (Jenner L. Evans, Defendant-Appellant).

First District (2nd Division)   No. 1—88—2384

Opinion filed February 20, 1990.

Michael R. Panter & Associates, of Chicago (Michael R. Panter, of counsel), for appellant.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (C. Morse, Joshua G. Vincent, and H. Wesley Sunu, of counsel), for appellee.

PRESIDING JUSTICE DiVITO delivered the opinion of the court:

Defendant-appellant Jenner L. Evans appeals from an order of the circuit court granting Allstate Insurance Company (Allstate) summary judgment in a declaratory judgment action. Allstate sought a judicial determination of its obligation to defend and indemnify its insured, Jeffrey Carioto, in a personal injury action brought by Evans. In that personal injury suit, which is still pending, Evans claims that Carioto acted either negligently or intentionally when, on February 28, 1982, he repeatedly stabbed Evans during the course of an armed robbery. Prior criminal proceedings against Carioto resulted in Carioto's entry of a plea of guilty to attempted murder.

The issues raised on this appeal are (1) whether Allstate's suit is premature, notwithstanding an intentional acts exclusionary clause of the insurance policy, Carioto's plea of guilty to attempted murder, and certain admissions made by Carioto at his deposition; (2) whether Allstate is estopped to assert the defense of noncoverage under the intentional acts exclusionary clause, because it retained a law firm with which it regularly did business to represent Carioto in the underlying tort action without fully disclosing its conflict of interest; (3) whether there is a question of fact as to "intent" precluding summary judgment; and (4) whether the 31-month delay in giving Allstate notice was timely, where Carioto forwarded the complaint and summons in the civil tort suit immediately upon being served, was a 19-year-old, mentally unstable alcoholic, and would not have known that a civil tort suit could result from an armed robbery and attempted murder.

On February 28, 1982, Jeffrey Carioto, the insured in this case, assaulted and repeatedly stabbed Jenner L. Evans during the course of an armed robbery on Rush Street in Chicago. Evans, a St. Louis, Missouri, resident, was staying at a friend's apartment on North La Salle Street near Elm Street while in Chicago on business. He walked to a Division Street restaurant where he bought some food to take out. He paid for the food with a $50 bill, left the restaurant, and began walking back to his friend's apartment.

Carioto and another man, John Haepp, saw Evans pay for his food with a $50 bill. The two men decided to rob Evans and followed as he left the restaurant. Carioto, armed with a four-inch blade knife, told Haepp that "he was going to stab the man and kill him."

As Evans walked west on the north side of Elm Street and was nearing La Salle Street, he heard shouts, turned, and saw the two men approaching him. Carioto brandished his knife and demanded

Evans' money. Evans threw his money on the ground toward the men. Haepp then tackled Evans, and Carioto joined in the struggle on the ground. Carioto repeatedly stabbed Evans with the knife, using an up-and-down motion with his arm. After five minutes, Haepp retreated, having been stabbed himself by Carioto. Carioto remained, however, and continued to stab Evans. Evans finally wrested the knife from Carioto, who then also fled. The physicians who examined and treated Evans found 15 to 17 separate stab wounds on various parts of Evans' body.

Carioto was arrested; pled guilty to attempted murder; and was sentenced to 15 years' imprisonment. At his sentencing hearing, he offered in mitigation the findings of Dr. Robert Wettstein, who found him to be a mental patient with severe psychological problems who was under the influence of alcohol and drugs when he assaulted Evans.

In 1983, Evans filed a civil suit for tort damages against Carioto and others. Only count I of Evans' original complaint was directed against Carioto. That count sought compensatory and punitive damages for assault. Count III alleged negligence against Carioto's mother for failing to supervise and control Carioto. Carioto was served at Logan Correctional Center in August 1984. He forwarded the suit papers to an attorney, who in turn forwarded them to Allstate, with which Carioto's mother carried homeowner's insurance. Allstate retained the firm of Williams & Montgomery to represent Carioto's mother, but rejected the tender of Carioto's defense under the insurance policy's intentional acts exclusionary clause, which excludes coverage for "bodily injury or property damage intentionally caused by an insured."

On June 10, 1985, Evans filed a third amended complaint which added a count alleging for the first time that Carioto's acts were "careless and negligent." Evans' amended complaint alleges Carioto's conduct to have been "careless and negligent" in the following respects:

"(a) [Carioto and Haepp] *carelessly* and *negligently fell on and/or came into contact* with Plaintiff [Evans] in such manner as to cause him injuries;

(b) [Carioto and Haepp] *carelessly* and *negligently failed to refrain* from *avoiding* Plaintiff;

(c) [Carioto and Haepp] *carelessly* and *negligently struck and/or came into contact* with Plaintiff with their hands and bodies and/or weapons *without any present intention* to inflict injury upon Plaintiff." (Emphasis added.)

Allstate then retained Williams & Montgomery to represent Carioto. Before entering an appearance for Carioto, Williams & Montgomery sent Carioto a letter seeking his consent to the representation. In that letter, dated September 24, 1985, Williams & Montgomery stated that its representation of Carioto created a conflict of interest. The letter explained that it was in Allstate's interest to have Carioto's acts construed as intentional, but in Carioto's interests to have the acts construed as negligent; that if Carioto consented to the representation by Williams & Montgomery, the firm would "do the utmost to defend [Carioto] to the best of [its] ability"; that Carioto was free to choose his own attorney at Allstate's expense; that Allstate would probably "take the position that they do not have coverage for Count I"; and that Williams & Montgomery would be paid by Allstate to represent Carioto. The letter did not mention the possibility of a suit by Allstate for declaratory relief, nor did it explain that Williams & Montgomery regularly represented Allstate in other matters. Carioto signed the letter on September 27, 1985.

On January 7, 1986, Allstate commenced this action for declaratory relief, alleging that it was not obligated to defend or indemnify Carioto against any of Evans' claims because of the intentional acts exclusionary clause in the insurance policy and the late notice of the claim.

On April 21, 1987, Allstate moved for summary judgment. Allstate argued that Carioto's guilty plea to attempted murder established as a matter of law that he either intended or expected to cause bodily injury to Evans and was thus not entitled to liability insurance coverage. Allstate also argued that it was entitled to declaratory relief on the basis of late notice of the occurrence.

Before responding to Allstate's summary judgment motion, Evans took Carioto's deposition. Carioto was prepared for the deposition by Williams & Montgomery. Carioto testified that he knew Evans had filed a lawsuit against him, which could result in a large money judgment against him for damages. He was then advised by Evans' counsel: that he "would owe this money judgment for the rest of [his] life or until [he] paid it"; that such a "judgment would not be dischargeable in bankruptcy" if it were to be determined that Carioto "intended to do what [he] did to Mr. Evans"; but that if it should be decided that Carioto "did not have the intent to do what [he] did that possibly [Allstate] would have to pay all or part of the judgment." After similar comments again were made to Carioto, he asserted on further questioning that he "didn't want to hurt anybody."

Upon further questioning, Carioto testified that he knew the State was required to prove every element of the attempted murder charge against him by saying:

"I know that's the State's job. Whether or not it was—I mean, yes, this would have to be. That is their job. That's what they've got to do, don't they? I mean the State's job is to prosecute me as the defendant. And if that's the case, they'd have to find an intent.

\* \* \*

Q. And knowing that, what you've just said, you made the plea of guilty to the crime of Attempted Murder?

A. Well, that's correct."

Still later in his deposition, Carioto testified that he remembered receiving a complaint in this lawsuit brought by Evans against him, and the following questions were put to and answers were given by him:

"Q. And you read through that complaint?

A. I read through it, yes.

Q. And do you remember reading allegations in that complaint made against you stating that you were careless and negligent in causing these injuries to Mr. Jenner Evans?

A. Yes. The reason why it stands out so much is because it was—well, it just doesn't sound proper.

Q. And why doesn't it sound proper?

A. Well, because of the words, the choice of words that they decided to use. I'm not very smart, but there's not much negligence in doing what was written on it saying what I done and I'm not proud of it and I'm not making some kind of humor or sarcasm here, but that wasn't all the most intelligent way of putting it as far as I'm concerned.

Q. So it wasn't really an accident, it was as careless and negligent might put it out to be, it's more from what you've read the intended acts that you did?

A. It was not—I'd have to say yes because that is what helped determine my pleading of guilty, although this suit wasn't into effect at the time. The facts were the facts on my case and there was no show there of any intent.

Q. So your guilty plea of Attempted Murder was that you intended to attempt murder and that's what the facts were?

A. It's not the way I would like to look at it now, but it is the truth, yes." (Emphasis added.)

Evans filed a motion to dismiss the present suit as premature be-

cause of the pending tort case. Evans also responded to Allstate's summary judgment motion, arguing that Allstate was estopped to assert its policy coverage defense by having "participated" in Carioto's defense in the underlying tort action in the face of a conflict of interest; that the declaratory judgment action was premature because the same issues are still being litigated as the tort action; that summary judgment was inappropriate because a question of fact existed concerning Carioto's intent; and that Carioto gave timely notice to Allstate of the claim against him. Evans' motion to dismiss was denied and Allstate's motion for summary judgment was granted.

## I

Evans maintains first that Allstate's declaratory judgment action was premature because the question of Carioto's intent was an "ultimate fact" yet undetermined in the pending tort action. Allstate concedes that a declaratory action is premature when it has the effect of resolving ultimate issues in the underlying tort action. However, relying on *Mid America Fire & Marine Insurance Co. v. Smith* (1982), 109 Ill. App. 3d 1121, 441 N.E.2d 949, Allstate argues that Carioto's guilty plea, together with the admissions at his deposition, establish that the nature of his conduct could never be an "ultimate issue" in the tort action.

█ As a general rule, insurers are encouraged to resolve coverage problems by filing declaratory judgment actions. (*Sims v. Illinois National Casualty Co.* (1963), 43 Ill. App. 2d 184, 199, 193 N.E.2d 123.) As "narrow exceptions" to that procedure, *Maryland Casualty Co. v. Peppers* (1976), 64 Ill. 2d 187, 355 N.E.2d 24, and *Thornton v. Paul* (1978), 74 Ill. 2d 132, 159, 384 N.E.2d 335, recognize that in instances where *bona fide* controversies arise over the issue of negligence versus intentional conduct, declaratory judgment actions are generally inappropriate. This is because declaratory judgments prior to the resolution of the underlying tort case might resolve "an issue crucial to the insured's liability in the personal injury action and also one on which punitive damages could ultimately be assessed *** in a purely ancillary proceeding with the plaintiff and defendant in the personal injury action both aligned on the same side as defendants in the declaratory judgment action." *Thornton v. Paul* (1978), 74 Ill. 2d 132, 159, 384 N.E.2d 335.

█ We do not believe a *bona fide* controversy exists, however, where the insured's conduct, a criminal conviction resulting from that conduct, and judicial admissions made by the insured, together provide conclusive evidence that the conduct was intentional. (See

*Mid America Fire & Marine Insurance Co. v. Smith* (1982), 109 Ill. App. 3d 1121, 441 N.E.2d 949.) In this case, the nature of the assault against Evans, and the initial allegations made by Evans in his suit against Carioto, are certainly consistent with Allstate's contention that Carioto's conduct was intentional. The complaint filed against Carioto on February 25, 1983, was for assault committed willfully and maliciously with force and arms against Evans. There is no question that such conduct is excluded under the Allstate homeowner's policy. Two and one-half years later, the third amended complaint alleged that Carioto's actions were merely "careless and negligent" in "falling on" or "failing to avoid" or "negligently striking" Evans. We find these allegations facetious, given that Carioto announced his intent to stab Evans; brandished his knife in order to effect the robbery; after receiving the object of the robbery, Evans' money, joined his accomplice in the struggle on the ground; and stabbed Evans 17 times even after his accomplice withdrew.

Carioto's guilty plea to attempted murder is further evidence that he acted intentionally. We recognize that a criminal conviction is only *prima facie*, not conclusive, evidence of an insured's intent. (See *Thornton v. Paul*, 74 Ill. 2d at 151; *State Farm Fire & Casualty Co. v. Shelton* (1988), 176 Ill. App. 3d 858, 862, 531 N.E.2d 913.) In *State Farm Fire & Casualty Co. v. Shelton*, for example, this court squarely rejected State Farm's claim that declaratory relief was appropriate before resolution of the underlying wrongful death action because the insured had been convicted of voluntary manslaughter following a bench trial. Carioto's guilty plea to attempted murder likewise did not, by itself, establish intentional conduct as a matter of law. In *Shelton*, however, the only evidence of intentional conduct was the insured's criminal conviction. In this case, by contrast, there is further evidence of intentional conduct in the nature of the assault against Evans, discussed above, and in Carioto's judicial admissions. Specifically, Carioto stated at his deposition that he intended to injure Evans after being told by an attorney present that the lawsuit could result in a large money judgment against him which he would owe for the rest of his life, and that it would not be dischargeable in bankruptcy if it were found that he intended the injury, but that the insurance company might have to pay part or all of that judgment if he did not intend to injure Evans.

We believe that the nature of the assault against Evans, Carioto's guilty plea, and his judicial admissions together provide conclusive evidence of intentional conduct. This conclusion is supported by *Mid America Fire & Marine Insurance Co. v. Smith*. In that

case, the insured pled guilty to the charge of criminal battery after he had kicked someone in the head. The injured person brought a tort action against the insured. Before resolution of that action, the insurer brought a declaratory judgment action, claiming it had no duty to defend or indemnify the insured. The insured was deposed and admitted that he intended to kick the tort plaintiff in the head. The trial court granted summary judgment in favor of the insurer, and the appellate court affirmed on the ground that the insured's guilty plea and admission at his deposition were conclusive evidence of intent. We likewise find conclusive evidence of intent and reject Evans' contention that this declaratory judgment action was brought prematurely.

■■ Our conclusion does not rest on *Bay State Insurance Co. v. Wilson* (1983), 96 Ill. 2d 487, 451 N.E.2d 880, relied on by Allstate. We find that case distinguishable on the ground that the declaratory judgment action went forward only after resolution of the underlying tort action, so that the declaratory judgment court had the full benefit of a trial transcript in determining the question of intent. Indeed, this court has recently noted that *"Bay State* reinforces the need for a resolution of the tort litigation before the declaratory judgment court decides the coverage issue. Only then can it determine if the insurance company must indemnify the insured based on the language of the policy." (*State Farm Fire & Casualty Co. v. Shelton,* 176 Ill. App. 3d at 866, 531 N.E.2d 913.) We do not intend to depart from this principle by our conclusion in this case. Rather, we believe it is proper for a declaratory judgment court to decide the coverage issue before resolution of the tort action in the rare case, such as this one, where there is conclusive evidence that the insured acted *intentionally.*

II

We consider next Evans' contention that the representation of Carioto by Williams & Montgomery, retained by Allstate, was not undertaken after full disclosure of Williams & Montgomery's conflict of interest. Evans argues that Allstate "participated" in Carioto's defense in the underlying tort action by retaining Williams & Montgomery to defend Carioto, so that Allstate is estopped to assert the defense of noncoverage based on Carioto's intentional conduct. Evans maintains that Allstate's only course of action was to obtain independent counsel to defend Carioto, otherwise a classic conflict of interest is created whereby Allstate benefits by a "less-than-vigorous" defense of its insured.

■ Under Illinois law, where there is a conflict of interest, an insurer is generally estopped to assert a defense of noncoverage where the insurer undertakes to defend its insured in the underlying tort action without reserving its rights. (*Maryland Casualty Co. v. Peppers* (1976), 64 Ill. 2d 187, 195, 355 N.E.2d 24.) This is because control over the insured's defense might affect coverage under the policy, so that if the insurer is silent about policy defenses, the insured might rely to his detriment on counsel selected and paid for by the insurer. Moreover, counsel regularly employed by the insurer faces an ethical dilemma if he also defends the insured in the underlying tort action because of the competing financial interests of the insured and the insurer. Ill. Code of Professional Responsibility, Ethical Considerations 5—14, 5—15, 5—17 (1970).

However, "[i]f [the insured] is willing to accept the defense furnished by the attorney engaged by [the insurer] after full disclosure to him by the attorney of the conflicting interests, the requirement of the Code of Professional Responsibility will be satisfied." (*Maryland Casualty Co. v. Peppers*, 64 Ill. 2d at 198.) The insured's consent to representation by counsel selected by the insurer after full disclosure also permits the insurer to raise the defense of noncoverage in a suit on the policy. *Maryland Casualty Co. v. Peppers*, 64 Ill. 2d at 198-99.

In this case, Williams & Montgomery, regularly employed by Allstate, sent Carioto a three-page *"Peppers* letter," which disclosed that Williams & Montgomery was being paid by Allstate and that a conflict of interest would arise if Williams & Montgomery undertook Carioto's defense. Specifically, the letter explained that it would be in Allstate's interest to have a determination that Carioto intentionally injured Evans and that Carioto was free to select his own attorney at Allstate's expense. Carioto signed the letter and returned it to Williams & Montgomery.

However, the letter did not reveal that Williams & Montgomery was regularly employed by Allstate. The letter explained that it would be in Allstate's interest to have a determination that Carioto intentionally injured Evans, but did not explain how Allstate's interest in this regard created a conflict of interest for Williams & Montgomery. After Carioto "consented" to the representation, an attorney from Williams & Montgomery prepared him for his deposition in this suit. Allstate now relies on admissions made by Carioto at that deposition. We also note that Williams & Montgomery never retained an expert to prove that alcohol, drugs, or psychological problems impaired Carioto's intent and never requested a stay in this action

pending resolution of the underlying tort case.

■ We do not believe that Carioto's representation by Williams & Montgomery contravened the principles set forth in *Peppers* such that Allstate is estopped to assert the defense of noncoverage in this declaratory judgment action. We do, however, strongly discourage the practice followed by Williams & Montgomery in this case. We note in particular that we would be more inclined to find a declaratory judgment action premature on the ground that a *bona fide* controversy exists regarding intent, if the insurer relies on judicial admissions made by an insured represented by a law firm retained by the insurer without full disclosure of the conflict of interest. Although such was the case here, as discussed above, our conclusion also rests on further evidence of intent in Carioto's guilty plea and in the nature of the assault against Evans.

### III

We consider next Evans' contention that summary judgment was inappropriate because a material question of fact existed as to whether Carioto intended to injure Evans. Evans argues that it is undisputed that Carioto was intoxicated at the time of the occurrence and whether Carioto's intoxication negated his intent is a question for the jury. Allstate concedes that Carioto was intoxicated, but argues that Carioto's intoxication could not, as a matter of law, negate intent in this case, because intoxication is not a defense to a general intent crime and "general intent" is the level of intent which the policy exclusion contemplates.

Initially, we note that there is little support for Allstate's argument that "intent" for purposes of an exclusionary clause in an insurance policy is identical to "general intent" as that term is understood in criminal cases. Allstate's reliance on *Cowan v. Insurance Co.* (1974), 22 Ill. App. 3d 883, 318 N.E.2d 315, in particular, is misplaced. In that case, the court construed an exclusionary clause similar to Allstate's as requiring a "specific intent" to cause harm to a third party. The court stated that "neither willful, wanton, or reckless misconduct amounts to a specific intent to cause injury." (*Cowan v. Insurance Co.*, 22 Ill. App. 3d at 893.) These are mental states commonly associated with general intent crimes, so that *Cowan* actually supports Evans' contention that "intent" for purposes of an exclusionary clause is not the same as "general intent."

Allstate's reliance on *Mid America Fire & Marine Insurance Co. v. Smith* (1982), 109 Ill. App. 3d 1121, 441 N.E.2d 949, is likewise misplaced. In that case, the court noted that intent for purposes of

tort liability is distinct from intent for purposes of an insurance policy's exclusionary clause. The court observed that other jurisdictions found intent for purposes of a policy exclusion "regardless of whether the tort defendant intended the specific injury as long as that defendant intended to injure the particular victim." (*Mid America Fire & Marine Insurance Co. v. Smith*, 109 Ill. App. 3d at 1123.) It does not follow, however, that intoxication could not negate intent for purposes of an exclusionary clause. Indeed, in *Smith*, the court considered the question of whether the insured was so intoxicated that he could not form the requisite intent to injure. The court rejected the insured's contention that he could not form the requisite intent only because the insured admitted at his deposition that he was not intoxicated. See also *Badger Mutual Insurance Co. v. Murry* (1977), 54 Ill. App. 3d 459, 464, 370 N.E.2d 295 (insured's conduct within exclusionary clause because, among other reasons, insured was "not so intoxicated as to be unable to realize the probable results of his actions").

As in *Smith* and *Murry*, we believe the question of Carioto's intoxication must be considered before it can be decided whether his conduct fell within the scope of the exclusionary clause in the insurance policy. As in *Murry*, we believe intoxication might negate intent for purposes of an exclusionary clause, but only if the insured was so intoxicated that he was not able to realize the probable results of his actions. Although we believe this question is ordinarily one for the trier of fact, we do not believe there is a material issue of fact regarding intoxication in this case, given Carioto's own admissions that he intended to harm Evans and the psychiatric evidence that he was able to appreciate the criminality of his conduct. The psychiatric report in the record indicates that Carioto had a history of violent and aggressive behavior and that his consumption of alcohol did not cause a loss of consciousness, hallucination, delusion, neurological dysfunction, or seizure disorder. The report concluded that "there was no sign of severe mental disturbance at a level of loss of reality contact at the time of or immediately subsequent to the alleged incidents." This record, we believe, belies Evans' contention that a material question of fact exists regarding the effect of Carioto's intoxication on his ability to form the requisite intent.

## IV

Finally, Evans maintains that Allstate was not entitled to summary judgment on the basis of late notice, because the notice was reasonable under all the facts and circumstances of this case. Al-

though we are affirming summary judgment in favor of Allstate for the reasons discussed above, for the reasons given below, we agree with Evans that Allstate was not entitled to summary judgment on the basis of late notice.

■ The purpose of a notice requirement in an insurance policy is to enable the insurer to make a timely and thorough investigation of the insured's claim. (*Barrington Consolidated High School v. American Insurance Co.* (1974), 58 Ill. 2d 278, 281, 319 N.E.2d 25.) Notice to the insurer must be reasonable under the facts and circumstances of each case. *Barrington Consolidated High School v. American Insurance Co.*, 58 Ill. 2d at 281; *Mitchell Buick & Oldsmobile Sales, Inc. v. National Dealer Services, Inc.* (1985), 138 Ill. App. 3d 574, 581, 485 N.E.2d 1281.

■ In this case, Carioto assaulted and stabbed Evans on February 28, 1982. In August 1984 he was served with the summons and complaint in Evans' tort action while in prison at Logan Correctional Center. He directly turned the papers over to an attorney, who then forwarded them to Allstate. Under the circumstances of this case, Allstate received timely notice. Carioto, a psychologically disturbed 19-year-old serving a 15-year prison sentence, could not reasonably be expected to know that Evans might file a civil suit against him and certainly could not be expected to know that the tort claims might be covered under his mother's homeowner's insurance policy. Furthermore, there is no indication in the record that Allstate was prejudiced by any delay in notice. See *Mitchell Buick & Oldsmobile Sales, Inc. v. National Dealers Services, Inc.*, 138 Ill. App. 3d at 581, 485 N.E.2d 1281 (absence of prejudice to the insurer is a factor in considering reasonableness of notice).

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

HARTMAN and SCARIANO, JJ., concur.