JOHN DOE *et al.*, Plaintiffs-Appellants and Counterdefendants-Appellants, v. ILLINOIS STATE MEDICAL INTER-INSURANCE EXCHANGE *et al.*, Defendants-Appellees (Illinois State Medical Inter-Insurance Exchange, Counterplaintiff-Appellee).

First District (2nd Division)   No. 1—91—1666

Opinion filed June 23, 1992.—Rehearing denied September 10, 1992.

130

Monico, Pavich & Spevack, of Chicago (Robert J. Pavich and Barry A. Spevack, of counsel), for appellants.

Hopkins & Sutter, of Chicago (Michael M. Conway and Robert R. Hall, Jr., of counsel), for appellees.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

This appeal involves the construction of two insurance policies. John and Jane Doe successfully sued a physician for several acts of medical negligence committed against John in 1984. Jane's action was based upon loss of John's services and companionship. The doctor was insured under two consecutive policies issued by Illinois State Medical Inter-Insurance Exchange (insurer) during the subject periods. Plaintiffs secured a judgment against the doctor, for which the insurer tendered to plaintiffs $1 million, the "per claim" limits of the first policy, but denied coverage under the second policy.

Plaintiffs filed a declaratory action against the insurer, seeking a clarification of coverage under the policies. Both parties filed motions for summary judgment, which the circuit court denied to plaintiffs but granted in the insurer's favor. Plaintiffs appeal, questioning among other issues whether (1) the insurer can deny coverage under the circumstances of this case; (2) the second insurance policy provided coverage for the doctor's successive negligent acts; and (3) the doctor's negligence fell within the aggregate limits of policy coverage requiring separate and discrete acts of negligence within the policy period.

On July 9, 1983, the insurer issued its policy to Dr. Gonzalo P. Magsaysay that covered him for acts of medical negligence he might commit between the period of July 1, 1983, through July 1, 1984. The policy provided $1 million in professional liability coverage for each claim arising within that period and $3 million in the aggregate for separate claims within the policy period. Dr. Magsaysay paid the insurer a premium of $22,308 per annum. A second policy, marked "renewal," providing essentially the same coverage, applied to the period from July 1, 1984, to July 1, 1985, for which Dr. Magsaysay paid an increased premium of $23,068 per annum.

Plaintiffs' underlying suit against Dr. Magsaysay for medical malpractice resulted in a jury verdict on June 22, 1990, in favor of plaintiffs in the amount of $2,452,500, after deducting 17% for John's contributory negligence. The insurer paid to plaintiffs $1 million plus interest on September 4, 1990, under the policy issued to Dr. Magsaysay for the period from July 1, 1983, to July 1, 1984. Plaintiffs sought a declaration that the second policy, effective from July 1, 1984, to July 1, 1985, also applied to Dr. Magsaysay's liability. The insurer answered, filed a counterclaim, and plaintiffs moved for judgment on the pleadings. Thereafter, the insurer moved for summary judgment and plaintiffs did the same. On April 26, 1991, the circuit court denied plaintiffs' motion, granted the insurer's motion and found that the insurer has no indemnity insurance liability for plaintiffs' injuries under the July 1, 1984, to July 1, 1985, policy.

To explicate the result in this appeal, the factual background in the underlying trial must be recounted. Dr. Mitchell V. Kaminski, Jr., a board-certified general surgeon, was called by plaintiffs as an expert witness. At plaintiffs' request, he reviewed medical and hospital records involving examination and treatment of John during 1984. John had consulted Dr. Magsaysay on February 16, 1984, and complained of excessive thirst and urination. This suggested diabetes. Determining that John's blood sugar level was significantly above normal, Dr. Magsaysay by telephone prescribed Diabinese. On February 24, 1984,

he examined John, but did not get a blood sugar determination on that date or at any time thereafter through June 14, 1984. Dr. Kaminski stated that greater measures should have been taken in monitoring John's blood sugar level during that period.

On June 14, 1984, Dr. Magsaysay by telephone prescribed for John the drug Lasix, a potent diuretic, without conducting an examination. In Dr. Kaminski's opinion, prescribing a diuretic for a patient who was losing water due to diabetes was negligent behavior because Lasix would cause further dehydration. He added that, having prescribed Lasix, Dr. Magsaysay was again negligent in not properly monitoring or testing plaintiff. Dr. Kaminski was of the opinion that Dr. Magsaysay's actions during this period fell below the acceptable standard of care in the community. Also, by prescribing Lasix, Dr. Kaminski concluded, Dr. Magsaysay caused plaintiff to develop pancreatitis, an opinion later concurred in by another of plaintiffs' experts, Dr. Robert J. Baker, a surgeon who subsequently operated on plaintiff for this condition.

On July 26, 1984, after the insurer issued the second professional liability policy to Dr. Magsaysay, covering the period from July 1, 1984, to July 1, 1985, John again contacted Dr. Magsaysay, complaining of abdominal pain. The doctor prescribed Aldactazide, another potent diuretic; however, according to Dr. Kaminski, he again failed to properly follow John's condition, since this diuretic, when taken in conjunction with another, required close monitoring. The doctor's actions again were below the acceptable standard of care in the community. John visited Dr. Magsaysay on August 9, 1984, complaining of abdominal pain. The doctor, although suspecting pancreatitis, treated John for ulcers, prescribing Zantac, which stops acid production, and Mylanta, an antacid.

On August 13, 1984, Dr. Magsaysay had John admitted to South Chicago Hospital. He was diagnosed as suffering from severe dehydration, pancreatitis and diabetic ketoacidosis. Dr. Kaminski testified that the tendency toward dehydration due to diabetes was compounded by the Lasix and Aldactazide, causing severe dehydration. He added that the diabetic ketoacidosis was caused by the failure to control the diabetes.

Dr. Kaminski testified that John's pancreatitis and other conditions could have been treated and resolved in relatively "straight order" within 10 days to two weeks, without surgery. Both Dr. Kaminski and Dr. Baker asserted that a patient diagnosed as suffering from pancreatitis required that the pancreas be rested, which means that the patient be fed nothing by mouth, but treated intraven-

ously. Instead, Dr. Magsaysay mistreated the pancreatitis and ordered a liquid diet for plaintiff which, Dr. Kaminski asserted, stimulated the pancreas to produce enzymes, already digesting the pancreas from within. By August 21, 1984, nonsurgical recovery was still possible, but the liquid diet continued. The pancreas continued to digest itself. A pseudocyst had formed by August 28, 1984; yet, oral feeding continued. By September 7, 1984, an abscess had formed. The condition became life threatening. Dr. Magsaysay performed surgery on John to drain pus. A second pancreatic abscess formed, which Dr. Kaminski urged was probably due to the continuation of the oral diet.

During the same hospitalization, Dr. Magsaysay mistreated John's diabetes. His blood sugar level, nutrition and dehydration had gone out of control. In Dr. Kaminski's opinion Dr. Magsaysay's management of these conditions as well fell below the acceptable standard of care in the community.

At a video-taped deposition, Dr. Baker, a general surgeon, revealed that John was transferred from South Chicago Hospital to the University of Illinois Hospital. By then, John was suffering from significant dehydration and had acute necrotizing pancreatitis. He was given large volumes of fluid and blood components. He was operated on twice. Dr. Baker removed much of John's pancreas, spleen and greater omentum, which had become infected. Dr. Baker added that John subsequently contracted hepatitis and tested HIV positive, probably due to the over 200 units of blood he received, an opinion with which Dr. Kaminski agreed. At that time, no effective method to screen for AIDS existed.

Following trial, the jury returned a general verdict in the amount of $1,452,500 for John and $1 million for Jane. The insurer paid plaintiffs $1 million plus judgment interest in accordance with the single claim limit under Dr. Magsaysay's July 1, 1983, to July 1, 1984, policy. The insurer refused to pay the remaining portion of the judgment with coverage from the July 1, 1984, to July 1, 1985, policy, contending that although the doctor's acts of negligence spanned the two policy periods, they represented one continuing series of related acts or omissions, which began during the July 1, 1983, to July 1, 1984, policy period and, therefore, the acts were only covered by the $1 million-per-claim limit of the earlier policy. The present lawsuit followed, with the motions and cross-motions resulting as first noted.

I

Plaintiffs contend that the insurer cannot deny coverage under the second policy because it did not defend under a reservation of

rights or file a declaratory judgment action, and because it controlled Dr. Magsaysay's defense despite a conflict of interest which it did not disclose to him.

The conflict, plaintiffs theorize, arises in the following way. Although both insurer and insured would benefit from findings of no liability, it was in the insurer's sole interest that any negligence occur totally within one policy period, or that negligence be found during the earlier policy with the subsequent acts occurring during the later policy being deemed "related." This latter scenario conflicted with Dr. Magsaysay's interest. If found liable, it would be in the doctor's interest that any negligent acts be adjudged to have occurred either during both periods or be considered unrelated. Otherwise, the doctor faced the situation in which the insurer now tries to leave him, underinsured, because the insurer says it does not have to pay his entire judgment. The insurer did not advise Dr. Magsaysay of its interpretation of the policy until after a verdict had been returned. By allowing him to proceed through trial without knowledge of this conflict and defending this case without a reservation of rights, plaintiffs maintain, the insurer violated a fundamental obligation owed an insured by his insurer, thereby resulting in an estoppel to raise the defense of noncoverage. *Illinois Masonic Medical Center v. Turegum Insurance Co.* (1988), 168 Ill. App. 3d 158, 522 N.E.2d 611.

● 1, 2 Where a conflict of interest exists, and an insurer neglects to reserve its rights, the insurer generally is estopped from asserting a defense of noncoverage when it undertakes to defend its insured in an underlying tort action. (*Allstate Insurance Co. v. Carioto* (1990), 194 Ill. App. 3d 767, 777, 551 N.E.2d 382 (*Carioto*).) An insurer has a duty to inform its insured adequately of the rights it intends to reserve when a policy defense may turn upon facts to be determined in that litigation. (*Cowan v. Insurance Co. of North America* (1974), 22 Ill. App. 3d 883, 318 N.E.2d 315 (*Cowan*).) An informed insured then can choose intelligently between retaining his own counsel or accepting counsel from the insurer. (*Cowan*, 22 Ill. App. 3d at 896.) An insurer's notice of reservation of rights must make specific reference to the policy defense which may be asserted and the potential conflict of interest. (*Cowan*, 22 Ill. App. 3d at 896.) Failure to defend under a reservation of rights, or secure a declaratory judgment as to coverage, estops an insurer from raising policy coverage defenses thereafter and renders the insurer liable for the award against the insured and the costs of the suit. (*Murphy v. Urso* (1981), 88 Ill. 2d 444, 430 N.E.2d 1079 (*Urso*).) Assumption and control of the insured's defense, absent a reservation of rights, estops the insurer from questioning

policy coverage. *Gibraltar Insurance Co. v. Varkalis* (1970), 46 Ill. 2d 481, 263 N.E.2d 823 (*Varkalis*).

■■ Plaintiff's medical treatment extended over the effective dates of two policies. Dr. Magsaysay and the insurer had conflicting interests, contrary to the insurer's assertions. It was clearly in the doctor's interest that his negligent acts be deemed unrelated and, therefore, covered under both policy periods. Otherwise, the doctor would be liable personally for any judgment corresponding to his conduct during the second policy period. Contrariwise, the insurer seeks to have the doctor's negligence constitute a series of related acts so that it has liability only under the 1983 to 1984 policy, which was in effect when the negligent conduct began. By not warning Dr. Magsaysay about this conflict, reserving its rights or filing a declaratory judgment action until after the verdict, the insurer is estopped from contesting coverage under the second policy here. *Carioto*, 194 Ill. App. 3d 767, 551 N.E.2d 382; *Cowan*, 22 Ill. App. 3d 883, 318 N.E.2d 315; *Urso*, 88 Ill. 2d 444, 430 N.E.2d 1079; *Varkalis*, 46 Ill. 2d 481, 263 N.E.2d 823; *Insurance Corp. of Ireland, Ltd. v. Board of Trustees* (7th Cir. 1991), 937 F.2d 331.

The insurer insists that it properly advised Dr. Magsaysay of his coverage and his right to seek other counsel. The record is to the contrary. Two letters were sent by the insurer to Dr. Magsaysay. The first was written on August 9, 1985.[1] The second letter was dated June 14, 1990, the day on which trial began in the underlying case.[2] Neither letter informed the doctor that the insurer would deny coverage as to more than one claim. Neither letter made specific reference to the policy defense. In neither letter is there found any mention of a potential conflict of interest. (*Cowan*, 22 Ill. App. 3d at 896.) The insurer was obliged to decline the defense (*Urso*, 88 Ill. 2d at 451), or adequately inform Dr. Magsaysay why it did not intend to provide coverage either for aggregate claims, or under the second policy, or advise him of the conflict of interest. Being so informed, at the least the doctor could have requested, even at that late date, submission to the jury of special interrogatories or an allocated verdict, which would

---

[1]The first letter, for some reason, interprets the coverage afforded Dr. Magsaysay as "bodily injury limits of $1,000,000 *per occurrence*" (emphasis added) rather than incorporating the policy language of "per claim."

[2]Interestingly, the August 9, 1985, letter advised Dr. Magsaysay that he had coverage from July 1, 1983, through July 1, 1985, the end of the coverage period of the second policy; however, without explanation, the 1990 letter, post-marked on the date that the underlying trial began, stated that he was covered only through July 1, 1984.

have specified the acts for which he was liable. *Duke v. Hoch* (5th Cir. 1972), 468 F.2d 973, 979 (*Duke*); *Gay & Taylor, Inc. v. St. Paul Fire & Marine Insurance Co.* (W.D. Okla. 1981), 550 F. Supp. 710, 716.

The insurer's reliance on *State Farm Mutual Automobile Insurance Co. v. Lucas* (1977), 50 Ill. App. 3d 894, 365 N.E.2d 1329, is unfounded. *Lucas* is inapposite to the case *sub judice*, since there the court found no waiver because the insured was specifically informed of a policy defense. (*Lucas*, 50 Ill. App. 3d at 898-99.) Unlike *Lucas*, here Dr. Magsaysay was not so informed.

The present insurer is estopped from denying coverage under the second policy; summary judgment entered in its favor accordingly must be reversed.

## II

Plaintiffs next assert that even if waiver and estoppel did not apply, judgment should have been entered for them because Dr. Magsaysay committed negligent acts and omissions during the effective dates of the July 1, 1984, to July 1, 1985, policy, independently of his previous conduct.

Plaintiffs rely on the policy's coverage agreement, which provides that the insurer will pay on Dr. Magsaysay's behalf all sums which he became legally obligated to pay as damages "because of personal injury arising out of the rendering of or failure to render, during the policy period ***, professional services." They point to Dr. Magsaysay's mistreatment of John's pancreatitis by having him fed by mouth, the prescription of Aldactazide in combination with Lasix without adequate monitoring, and his failure to control John's elevated blood sugar, dehydration and nutrition during the effective dates of the second policy period.

The insurer counters with the policy's provision that "all personal injuries sustained by one or more persons arising out of a single act or omission or a series of related acts or omissions in the rendering of or failure to render professional services to any one person shall be considered one claim." Based upon this language, the insurer urges that the doctor's negligence constituted one claim as a series of related acts and, therefore, the insurer was liable for the one claim limit of $1 million, which was already paid. The insurer asserts that the clause it relies upon is clear, unambiguous and should be applied as written. (*American Standard Insurance Co. v. Allstate Insurance Co.* (1991), 210 Ill. App. 3d 443, 446, 569 N.E.2d 162 (*American Standard*).) We disagree.

The "related acts" provision of the policy is ambiguous for several reasons. First, although the insurer insists the clause excludes liability, it is not found in the policy section containing the other liability exclusions. Second, the clause is located in the limits of liability section, which does not exclude coverage, but defines the number of claims possible once coverage exists. Third, the provision is predicated upon the prepositional phrase "under this policy," making it unclear as to how the clause could possibly exclude coverage when another policy existed. Finally, the term "related" is not defined in the policies and has no generally accepted legal meaning.[3]

■ Insurance contracts are analyzed for the purpose of ascertaining the intent of the parties; ambiguous policy language will be construed against the insurer. (*Dairyland Insurance Co. v. Linak* (1991), 208 Ill. App. 3d 892, 896, 567 N.E.2d 638; *Jacobs v. Central Security Mutual Insurance Co.* (1990), 194 Ill. App. 3d 1094, 1096, 551 N.E.2d 1059.) An insurance contract will be considered ambiguous if it is subject to more than one reasonable interpretation. (*American Standard*, 210 Ill. App. 3d at 446.) In determining whether there is an ambiguity, the clause must be read within its factual context. (*American Standard*, 210 Ill. App. 3d at 446.) As here, when an exclusionary clause in a policy is relied upon to deny coverage, its applicability must be clear and free from doubt; any question with respect to coverage will be resolved in favor of the insured. (*American Standard*, 210 Ill. App. 3d at 446.) Under the foregoing rules of construction, and in light of the policy language chosen by the insurer, it is evident that Dr. Magsaysay's post-July 1, 1984 negligence is covered by the July 1, 1984, to July 1, 1985, policy.

■ The insurer posits that the second policy was simply a renewal, indicating additional payment to plaintiffs would constitute double coverage under the same policy; however, in Illinois, the renewal of an insurance policy is generally conceived to be a new contract (*Village of Camp Point v. Continental Casualty Co.* (1991), 219 Ill. App. 3d 86, 103, 578 N.E.2d 1363, *appeal denied* (1992), 143 Ill. 2d 636 (*Village of Camp Point*)), particularly where, as here, material and significant differences exist, such as effective dates, increased premiums, and the fact that the policy is conditioned upon new representations by the insured as to his current standing in his profession.

---

[3] "Related act" has been interpreted to mean "causally connected" rather than "logically connected," thereby dependent upon objective facts rather than subjective mental processes. *Arizona Property & Casualty Insurance Guaranty Fund v. Helme* (1987), 153 Ariz. 129, 735 P.2d 451.

Therefore, the latter policy was not a mere continuation of the former. See *Bronstein v. I N A Life Insurance Co. of North America* (1990), 207 Ill. App. 3d 910, 566 N.E.2d 484.

■ The negligence committed by Dr. Magsaysay on and after July 1, 1984, was independent of that which he committed during the preceding period, a point further developed in part III of this opinion. Summary judgment entered for the insurer on this issue was in error and must be reversed.

## III

Plaintiffs claim that even if the "related acts" language applies to both policies, summary judgment should have been granted for them because at least two separate acts of negligence occurred during the second policy period, apart from his negligence during the first policy period, entitling Dr. Magsaysay to insurance coverage of up to the aggregate sum of $3 million.

The jury was instructed that plaintiffs claimed they were injured and defendant was negligent "in one or more of the following respects," listing a multiple number of possibilities. Also, the jury was instructed that plaintiffs had the "burden of proving *** defendant acted or failed to act in one of the ways claimed *** and in so acting or failing to act, the defendant *** was negligent." The verdict for plaintiffs did not specify which acts of negligence were proved, stating only that the damages suffered resulted from "the occurrence in question." The jury may have found defendant negligent in "one or more" of the ways plaintiffs claimed, as instructed. Which of those ways were proved, during which policy period the negligent acts were committed, or whether no negligence was committed during the first policy period or, alternatively, during the second policy period, are questions not put to the jury by either party. Although the insurer suggests that plaintiffs should have submitted special interrogatories or an allocated verdict form to the jury, it was the insurer who was aware that such a problem existed as between itself and its insured, Dr. Magsaysay; therefore, it was the insurer's obligation to ameliorate its own allocation difficulty. *Duke*, 468 F.2d at 979.

Several issues having been presented to the jury, its return of a general verdict created the presumption that all material issues of fact upon which evidence was received were decided in favor of plaintiffs. (*McMahon v. Richard Gorazd, Inc.* (1985), 135 Ill. App. 3d 211, 217, 481 N.E.2d 787; *Perry v. Saleda* (1975), 34 Ill. App. 3d 729, 735, 340 N.E.2d 314; see also *Peoples v. Granite City Steel Co.* (1982), 109 Ill. App. 3d 265, 269-71, 440 N.E.2d 363; *Klingler Farms, Inc. v.*

*Effingham Equity, Inc.* (1988), 171 Ill. App. 3d 567, 572, 525 N.E.2d 1172.) The jury instruction having been presented in the disjunctive, it cannot be presumed that the verdict was in favor of all possible conclusions. (*Cowan*, 22 Ill. App. 3d at 894-95.) Which of the various acts were proved cannot be ascertained from this record. The insurer's failure to inform Dr. Magsaysay that such a finding was necessary to ascertain coverage available to him under the policies has led to these circumstances.

The insurer maintains that all negligent acts constituted one continuing action and were properly covered as one claim under the July 1, 1983, to July 1, 1984, policy, in effect when the acts began; therefore, no matter which act or acts were proved, only the first policy would be applicable. In support of its theory, the insurer points to Dr. Kaminski's testimony that Dr. Magsaysay's actions constituted a "chain of events, a domino effect" leading up to plaintiff contracting the viruses. The "domino effect," however, does not merge each of the negligent actions into one.

The record here demonstrates that after the first policy period expired, Dr. Magsaysay prescribed a new and potent diuretic, Aldactazide, for John on July 26, 1984, to be taken in conjunction with his previously prescribed Lasix. He then failed to monitor this hazardous combination, causing John to become severely dehydrated. Dr. Kaminski testified that these acts and failures, which occurred within the effective dates of the second policy, constituted negligence, and led to John's pancreatitis.

Thereafter, on August 13, 1984, John was admitted to the hospital suffering from moderate pancreatitis, severe dehydration and diabetic ketoacidosis. Dr. Magsaysay then committed further new and separate negligent acts. Improperly, he treated the pancreatitis by feeding John by mouth. He then committed additional acts of negligence by failing to monitor John's nutritional status, failing to institute total parenteral nutrition, and failing to prescribe for John the fluids he needed. These new acts and failures were separate, not only from those committed during the first policy period, but were different from each other, giving rise to several claims under the second policy.

An insured who commits separate negligent acts in the treatment of a single patient becomes amenable to multiple claims. In *Arizona Property & Casualty Insurance Guaranty Fund v. Helme* (1987), 153 Ariz. 124, 735 P.2d 451, for example, an insurance policy covered two doctors up to $3 million per occurrence. One doctor did not diagnose the patient's worsening medical problem or adequately review X rays, causing the patient's condition to further deteriorate. The second doc-

tor also failed to review the X rays, yet operated on him, contributing to the patient's death. Each of the diagnostic failures was found to constitute a separate causal act by the doctors, and each gave rise to separate claims. *Helme*, 153 Ariz. at 127, 735 P.2d at 458.

In *St. Paul Fire & Marine Insurance Co. v. Hawaiian Insurance & Guaranty Co.* (1981), 2 Haw. App. 595, 637 P.2d 1146, the insured's estate contended that on three occasions, once by one doctor, and twice by another, the decedent was administered anesthesia negligently, contributing to his death. The primary insurer settled for both doctors in the amount of $165,000, and then sued the excess carrier for the amount over $100,000-per-claim policy limits. The court identified three separate acts of negligence leading to decedent's death, resulting in three claims. The court observed that if the two physicians had been insured by different insurers a claim had been stated against each. Only because of their being insured by the same insurer was it asserted that these are not separate claims against them.

In *Wiltshire v. Government of Virgin Islands* (3d Cir. 1990), 893 F.2d 629 (*Wiltshire*), doctors fed a relatively healthy, but premature, baby through a UV catheter that remained in place for seven days, despite the danger of serious infection through extended use. Infection eventually occurred, causing the baby's condition to deteriorate. When she developed difficulty in breathing, cardiopulmonary resuscitation was negligently administered, aggravating her condition. The hospital fed her through an IV feeding line inserted into her scalp. The IV line leaked and caused disfiguring scars on her forehead and face. These negligent acts caused spastic quadriparesis, a seizure disorder and disfiguring permanent scarring. The negligence was considered to be three separate occasions in malpractice.

In the case *sub judice*, during the effective dates of the July 1, 1984, through July 1, 1985, policy, Dr. Magsaysay negligently prescribed Aldactazide in combination with Lasix and did not monitor John's blood sugar levels. When John developed pancreatitis, dehydration and diabetic ketoacidosis, Dr. Magsaysay committed new and additional acts of negligence. His decision to have John fed by mouth is one example. Dr. Magsaysay did not have John fed by mouth because he failed to properly prescribe and monitor certain drugs given him months before; it was because he failed to treat a new condition properly.

■ It is the causative events producing the damage that constitute actionable conduct, not the number of injuries. (*Village of Camp Point*, 219 Ill. App. 3d at 101; *Illinois National Insurance Co. v. Szczepkowicz* (1989), 185 Ill. App. 3d 1091, 542 N.E.2d 90.) These "addi-

tional separate and distinct acts of negligence" (*Wiltshire*, 893 F.2d at 636) gave rise to two or more separate claims under the second insurance policy.

Dr. Magsaysay's discrete acts of unrelated negligence during the second policy period invoke the aggregate limits provision of that policy. It was error to hold otherwise.

For the foregoing reasons, we reverse and remand to the circuit court with instructions to enter orders requiring the insurer to pay plaintiffs the balance of the jury verdict and judgment.

Reversed and remanded.

SCARIANO and DiVITO, JJ., concur.