NOTICE
Decision filed 04/08/21. The text of this decision may be changed or corrected prior to the filing of a Peti ion for Rehearing or the disposition of the same.

2021 IL App (5th) 190098

NO. 5-19-0098

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| FREEBURG COMMUNITY CONSOLIDATED SCHOOL DISTRICT NO. 70, an Illinois Body Politic; HERSCHEL PARRISH; CLARENCE HAEGE; and LAWRENCE MEGGS, | ) ) ) ) ) | Appeal from the Circuit Court of St. Clair County. |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | No. 14-MR-384 |
| COUNTRY MUTUAL INSURANCE COMPANY, an Illinois Corporation; RSUI INDEMNITY COMPANY; and JOHN DOE 4, | ) ) ) ) ) | |
| Defendants | ) ) | Honorable Stephen R. Rice and Honorable Julie K. Katz, |
| (RSUI Indemnity Company, Defendant-Appellant). | ) | Judges, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court, with opinion.
Justices Moore and Vaughan[*] concurred in the judgment and opinion.

**OPINION**

¶ 1       The instant appeal involves a coverage dispute pertaining to a claims-made insurance

policy (policy) issued by defendant, RSUI Indemnity Company (RSUI), to plaintiff, Freeburg

Community Consolidated School District No. 70 (Freeburg school district), and its directors and

_____

[*]Justice Cates was originally assigned to this case but recused following oral argument. Justice Vaughan was subsequently assigned to replace her. Justice Vaughan has read the briefs and listened to the oral argument recording.

1

officials. The policy covered claims made during the policy period July 1, 2013, to July 1, 2014. RSUI denied Freeburg school district's demand for coverage under the policy for an underlying federal lawsuit (Doe 4 action) filed against Freeburg school district and certain former Freeburg school district officials, Herschel Parrish, Clarence Haege, and Lawrence Meggs,[1] on June 11, 2014. The Doe 4 action was brought by John Doe 4, a former Freeburg school district student, who alleged that he had been sexually abused on multiple occasions, by a male Freeburg school district official, Robin Hawkins (now deceased), from 2007 to spring of 2009.

¶ 2 Freeburg filed a complaint for declaratory judgment against RSUI[2] in the circuit court of St. Clair County, seeking a determination that RSUI had a duty to defend and indemnify Freeburg in the Doe 4 action. RSUI filed a motion to dismiss Freeburg's complaint, pursuant to section 2-619 of the Code of Civil Procedure (735 ILCS 5/2-619 (West 2014)), which was denied by the court. The court subsequently granted Freeburg's motion for summary judgment on the issue of RSUI's duty to defend Freeburg in the Doe 4 action but reserved ruling on the issue of indemnity. RSUI filed a motion for summary judgment, and Freeburg filed a cross-motion for summary judgment seeking further determination on the issues of RSUI's duty to defend and duty to indemnify Freeburg in the Doe 4 action. The court later denied RSUI's motion for summary judgment and granted Freeburg's cross-motion for summary judgment, determining that RSUI had a duty to indemnify Freeburg in the Doe 4 action. Thereafter, the court ordered RSUI to indemnify Freeburg in the amount of $1,159,144.37. RSUI appeals, arguing that the court erred in finding that it had a duty to defend and indemnify Freeburg in the Doe 4 action under the policy. For the following reasons, we reverse in part, vacate in part, and remand with directions.

---

[1]Except where a distinction is necessary for clarity, we will collectively refer to the plaintiffs, Freeburg school district, Herschel Parrish, Clarence Haege, and Lawrence Meggs as "Freeburg."
[2]Country Mutual Insurance Company and John Doe 4 were also named as defendants in the complaint but are not parties to this appeal.

¶ 3                                    I. Background

¶ 4    The instant case has a lengthy procedural history. The common law record is in excess of 4900 pages, and the transcripts of the various circuit court proceedings exceed 500 pages. In the interest of brevity, we have omitted facts not germane to our resolution of the issues raised on appeal.

¶ 5                                    A. Prior Litigation

¶ 6    From 1977 to 1993, Hawkins was employed by Freeburg school district as a teacher, also serving as a counselor, student council sponsor, and coach for the basketball and track teams. In 1994, he was promoted to principal and assistant superintendent. In 1998, Hawkins was, again, promoted, serving as superintendent until his death by suicide in May 2009. Hawkins's suicide occurred after he became aware that the Illinois State Police and Freeburg Police Department were investigating Hawkins's alleged sexual abuse of several elementary students dating back to 1979.

¶ 7    Following the investigation, at least three federal lawsuits were filed against Freeburg between 2010 and 2012.[3] The first lawsuit (Doe 1 action) alleged that Doe 1 had been sexually abused by Hawkins on multiple occasions while attending the Freeburg school district's Carl L. Barton Elementary School from 1994 to 1996. The second lawsuit (Doe 2 action) alleged that Doe 2 had been sexually abused by Hawkins on multiple occasions while attending Carl L. Barton Elementary School in 1991. The third lawsuit (Doe 3 action) alleged that Doe 3 had been sexually abused by Hawkins on multiple occasions while attending Carl L. Barton Elementary School from 2005 to 2008.

---

[3]All three lawsuits named as defendants Parrish, Haege, and Meggs, individually and in their official capacities, and Freeburg school district.

¶ 8                    B. Prairie State Insurance Cooperative

¶ 9    Subsequent to the Doe 1 action, Freeburg school district sought to join the Prairie State Insurance Cooperative (PSIC), which is comprised of 134 public schools, for the purpose of acquiring a new insurance carrier in place of its insurance carrier at that time, Country Mutual Insurance Company (Country Mutual). On September 30, 2010, Bob Pegg, PSIC's executive director, and Don Bagley, an insurance producer, met with Tomi Diefenbach, Freeburg school district superintendent, to discuss the "possibility" of Freeburg school district joining PSIC.

¶ 10   On October 27, 2010, Doug Ransom, an insurance broker with Risk Placement Services, Inc., sent an e-mail to Eddie Flodberg, the area assistant vice president of Arthur J. Gallagher Risk Management Services, Inc., requesting details of the September 30, 2010, meeting with Diefenbach. Ransom included a link to an article concerning a former Freeburg school district student, who had made allegations of sexual molestation against Hawkins. Ransom specifically requested details surrounding the sexual abuse claims. Ransom expressed that, although claims by this "perp" would be excluded, allegations that there was an alleged cover-up "may make it difficult to cover this line without better detail."

¶ 11   Flodberg responded by informing Ransom via e-mail that PSIC was aware of the sexual molestation allegations against Hawkins. Flodberg also attached an e-mail from Pegg, which was intended for PSIC's executive committee, summarizing the details of the September 30, 2010, meeting. Pegg's e-mail, in pertinent part, states the following:

   "The reason for our visit was to discuss with the district the possibility of joining the PSIC. I would like to give the PSIC Executive Committee a brief summary of our visit.

       I felt the visit to the school was necessary due to the allegations filed in 2010 that the former superintendent was involved in the sexual molestation of a student. Prior to this

4

formal complaint being filed[,] Superintendent Rob Hawkins' [*sic*] had committed suicide in 2009. Mr. Hawkins was superintendent from 1999 until his death in May 2009. Actually nothing was formally filed until July, 2010, against Mr. Hawkins. Rumors and hearsay of the alleged incident is what lead [*sic*] to the suicide of Mr. Hawkins. Since the alleged incident was reported, claims have been made that the incidents had been reported to the two previous Freeburg superintendents and they did not take the appropriated [*sic*] steps to investigate these incidents. I will add that the school and the former superintendents deny these allegations. There has been one lawsuit filed against the school (Doe vs. FCCSD#70) that is on file at the time of this report.

        ***

        Our purpose in the visit was to determine if the issues at the school are confined to the alleged acts of past superintendents and are not reflected in the current leadership at the school. Second, we need to be secure that the PSIC would not be exposed to any possible legal activity in the ongoing litigation. *** I think it is important to note that the alleged activity by Mr. Hawkins occurred during the middle 1990's and none of the current school leadership was at the school at that time. The alleged conduct is reported to have happened during the middle 1990's at a time when Mr. Hawkins was a teacher and coach at the school. The alleged conduct was reported by one student not several students. There have been no reported incidents in the years when Mr. Hawkins was school superintendent. In July, 2010, the two former superintendents were sued in the case. Claims have been made that they were aware of the misconduct of Mr. Hawkins occurring in 1990 and they did nothing about it. However, they have indicated not [*sic*] claims were made known to them during this time.

5

***

Can the PSIC as the potential carrier for the school become embroiled in this litigation? I do not think this is possible with one important change to our policy. The school was not carrying sexual molestation coverage during the time when this incident happened. When the coverage was added (after the alleged conduct came to light and the suicide of Mr. Hawkins) for sexual molestation in May of 2009[,] the current carrier used a retro date of 9/25/08. The current administrators do not know why this particular date was selected. The PSIC should extend our retro date only to that 9/25/08 date. That would protect the PSIC from any 'unknown' occurrence happening dating prior to 9/25/08. All current reported claims have come from the middle 1990's. One of the previous superintendents served as interim superintendent after the death of Mr. Hawkins. Again, this requires that we modify are [*sic*] current 7/1/06 retro date for this one district. I feel that is a fair and appropriate action by the PSIC.

***

*** I do not feel that this district and their current leadership should be held responsible for the past acts of Mr. Hawkins. More importantly, the PSIC will be protected from these past actions."

Freeburg school district was subsequently permitted to join PSIC.

¶ 12     In 2013, PSIC, on behalf of Freeburg school district, acquired the policy from RSUI. The policy, numbered NHP652175, listed an effective date of July 1, 2013, and provided a $1 million aggregate limit of liability for claims first made during the policy period (July 1, 2013, to July 1, 2014). The policy also listed a "Prior And/Or Pending Litigation Date" of July 1, 2009, excluding all occurrences prior to that date from coverage, no matter when the claim is first made.

6

¶ 13                                C. Disputed Policy Provisions

¶ 14    The policy included, *inter alia*, the following disputed provisions:

"In consideration of the payment of premium and in reliance upon all statements made to

the *Insurer* in the *Application*, and subject to the terms, conditions, definitions, exclusions

and limitations hereinafter provided, the *Insurer* agrees:

SECTION I—INSURING AGREEMENTS

* * *

B. With the *Insured Organization* that if a *Claim* for a *Wrongful Act* is first made

against any *Insured Person* during the *Policy Period* and reported in accordance with

SECTION V.—CONDITIONS, C. Notice of Claim or Circumstance of this policy, the

*Insurer* will pay on behalf of the *Insured Organization* all *Loss* for which the *Insured*

*Organization* is required or permitted to indemnify the *Insured Person.*

C. With the *Insured Organization* that if a *Claim* for a *Wrongful Act* is first made

against the *Insured Organization* during the *Policy Period* and reported in accordance with

SECTION V.—CONDITIONS, C. Notice of Claim or Circumstance of this policy, the

*Insurer* will pay on behalf of the *Insured Organization* all *Loss* the *Insured Organization* is

legally obligated to pay." (Emphases in original.)

¶ 15    Section III, titled "DEFINITIONS" (emphasis in original), provided various definitions of

the emphasized terms appearing throughout the policy. According to the policy, as defined in

section III.B, the term "Claim" means:

"B. *Claim*, either in the singular or the plural, means:

1. A written demand for monetary or non-monetary relief;

7

2. A civil, criminal, administrative, regulatory or arbitration proceeding for monetary or non-monetary relief which is commenced by:

a. Service of a complaint or similar pleading;

b. Return of an indictment (in case of a criminal proceeding); or

c. Receipt of a notice of charges ***." (Emphasis in original.)

¶ 16    The term "Employment Practices Wrongful Act" was defined, in relation to specified employment related matters, under section III.F.1-14. Specifically, section III.F.14 provides, in pertinent part, any actual or alleged:

"14. Negligent hiring, retention, training or supervision, infliction of emotional distress, or violation of an individual's civil rights, when alleged in conjunction with any of the foregoing items 1. through 13, whether such *Employment Practices Wrongful Act* as described in 1-14 above is committed directly, indirectly, intentionally or unintentionally, but only if the *Employment Practices Wrongful Act* actually or allegedly pertains to acts committed by an *Insured* and are alleged against an *Insured* by an *Insured Person* or applicant for employment with the *Insured Organization*." (Emphases in original.)

¶ 17    Additionally, the term "Wrongful Act" was defined, under section III.O, as follows:

"O. *Wrongful Act* means any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty, or any *Employment Practices Wrongful Act* or *Personal Injury Wrongful Act*, by:

1. *An Insured Person* while acting in his or her capacity as such and on behalf of the *Insured Organization* or any matter claimed against them solely by reason of their status as an *Insured Person*; or

2. The *Insured Organization*." (Emphases in original.)

8

¶ 18    Moreover, the policy contained a modifying endorsement page titled "Third Party Coverage Including Title IX Wording," amending section III, by adding, in pertinent part, the following:

"A. The *Insurer* shall pay for *Loss* arising out of or in connection with any *Claim* made against any *Insured* alleging, arising out of, based upon or attributable to any *Third Party Discrimination* and/or *Third party Sexual Harassment.*

B. SECTION III.—DEFINITIONS is amended by adding the following with respect to coverage provided by this endorsement:

1. *Third Party* means any person(s) with whom an *Insured* interacts.

2. *Third Party Discrimination* means any discrimination by an *Insured* in his or her capacity as such against a *Third Party* based on such *Third Party's* race, color, creed, religion, age, gender, national origin, sexual orientation or preference, disability, pregnancy or other protected status that is protected pursuant to any applicable federal, state or local statute or ordinance.

3. *Third Party Sexual Harassment* means unwelcome sexual advances, requests for sexual favors, or other verbal, visual or physical conduct of a sexual nature that is made by an *Insured* to a *Third Party.*

4. SECTION III.—DEFINITIONS, O. *Wrongful Act* is amended to include alleged violations of Title IX, provided there will be no coverage for equitable funding or amounts incurred to bring facilities into compliance with Title IX.

C. SECTION III.—DEFINITIONS, F. *Employment Practices Wrongful Act* is amended to include any actual or alleged *Third Party Discrimination or Third Party Sexual Harassment* as defined in paragraphs B.2. and B.3. above." (Emphases in original.)

9

This modifying endorsement page also expressed that "[a]ll other terms and conditions of this policy remain unchanged."

¶ 19    Section IV provided various enumerated "EXCLUSIONS," including, *inter alia*, exclusions 8 and 10, as follows:

"The Insurer shall not be liable to make any payment for *Loss* in connection with any *claim* made against any *Insured*:

* * *

8. Alleging, arising out of, based upon or attributable to directly or indirectly, the same or essentially the same facts underlying or alleged in any matter which, prior to the inception date of this policy, has been the subject of notice to any insurer of a *Claim*, or a potential or threatened *Claim*, or an occurrence or circumstance that might give rise to a *Claim* under any policy of which this insurance is a renewal or replacement or which it may succeed in time.

***

10. Alleging, arising out of, based upon or attributable to, in whole or in part, any litigation involving any Insured that was commenced or initiated prior to or was pending at the inception date of this policy, or arising out of or based upon, in whole or in part, any facts or circumstances underlying or alleged in any such prior or pending litigation." (Emphases in original.)

¶ 20    The policy also contained two modifying endorsement pages regarding certain specified exclusions under section IV. The first modifying endorsement page, titled "AMENDED BODILY INJURY AND PROPERTY DAMAGE," amended exclusion IV.3.a., as follows:

10

"Alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly:

a. bodily injury, sickness, disease or death of any person, mental anguish or emotional distress; provided, this EXCLUSION 3.a. shall not apply to allegations of mental anguish or emotional distress made solely in connection with an *Employment Practices Claim* ***." (Emphases in original.)

The second modifying endorsement page, titled "Exclusion—Sexual Abuse with EPL [(employment practices liability)] Carve Back," added the following exclusionary provision:

"The *Insurer* shall not be liable to make any payment for any *Loss* in connection with any *Claim* (including but not limited to any derivative or representative class actions) made against any *Insured* alleging, arising out of, based upon or attributable to, or in any way involving any sexual abuse or sexual assault, molestation, child abuse or neglect; provided that this exclusion shall not apply to any *Claim* alleging an *Employment Practices Wrongful Act.* " (Emphases in original.)

Additionally, these two endorsement pages also expressed that "[a]ll other terms and conditions of this policy remain unchanged."

¶ 21 Section V contained enumerated limits of liability provisions, which placed certain limitations on claims made under the policy. Section V.B.3 provided the following limitation:

"3. All *Claims* based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transaction or events, or the same or related series of facts, circumstances, situations, transactions or events shall be deemed to be a single *Claim* for all purposes under this policy, shall be subject to the Retention stated in Item E. of the Insured

11

Organization Limits of Liability endorsement, and shall be deemed first made when the earliest of such *Claims* is first made, regardless of whether such date is before or during the *Policy Period.*" (Emphases in original.)

In addition, the policy contained a modifying endorsement page with regard to section V. Section V.E, as modified, titled "Other Insurance and Indemnification," provided that the policy is designated an excess insurance policy under the following circumstance:

"E. If any Loss resulting from any *Claim* is insured by any other valid policy the Insurer shall not be liable under this policy for a greater proportion of such Loss than the applicable *Limit of Liability* stated in the *Declarations Page* bears to the total applicable *Limit of Liability* of all valid and collectible insurance against such *Loss* unless such other insurance is purchased specifically to apply in excess of the *Limit of Liability* stated in the *Declarations Page* of this policy." (Emphases in original.)

¶ 22    Lastly, the policy contained a separate provision titled "INSURED ORGANIZATIONAL LIMITS OF LIABILITY." The policy provided an aggregate limit of liability for claims first made during the policy period of $1 million subject to a $0 retention for individuals and $10,000 retention for Freeburg school district per claim.

¶ 23                                    D. Doe 4 Action

¶ 24    The Doe 4 action was filed by John Doe 4 in the United States District Court for the Southern District of Illinois (district court). In the complaint, John Doe 4 alleged that he had been sexually abused by Hawkins when Hawkins was Freeburg school district's superintendent and John Doe 4 was a seventh and eighth grade student at Carl L. Barton Elementary School.

¶ 25    The complaint stated that "[Freeburg school district], by and through its school board members, administrators, teachers, agents and/or employees," was aware of multiple reports of

sexual harassment and abuse of minor male students by Hawkins prior to John Doe 4's enrollment in Freeburg school district but failed to prevent Hawkins from sexual abusing John Doe 4. The complaint contained nine separate counts, namely, (1) Title IX discrimination (a violation of Title IX of the Education Amendments Act of 1972 (20 U.S.C. § 1681 *et seq.* (2006)), (2) substantive due process, (3) violations procedural due process, (4) denial of constitutional liberty interests, (5) negligent infliction of emotional distress, (6) failure to supervise, (7) negligent failure to control conduct of Hawkins, (8) failure to protect, and (9) the Gender Violence Act (740 ILCS 82/1 *et seq.* (2014)). Each count made similar factual allegations and assertions, including that as "a direct and/or proximate result" of the conduct of Parrish, Haege, and Meggs:

"[John] Doe 4 suffered sexual harassment and sexual abuse, and has sustained severe and permanent physical bodily injury, sickness and/or disease resulting in, but not limited to, mental and/or emotional injury, anxiety, panic attacks, sexual dysfunction, inter-personal relationship and intimacy dysfunction, and behavioral dysfunction, and as a result thereof he has and will continue to experience:

a. Physical and mental pain and suffering;

b. Emotional distress;

c. Loss of a normal life;

d. Medical and counseling expenses; and

e. Lost wages."

Each count also requested that the district court enter a judgment for monetary damages, against Freeburg, in favor of John Doe 4.

¶ 26    Thereafter, on March 26, 2015, John Doe 4 filed a first amended complaint in the district court, which contained similar factual allegations and counts as the original complaint.

13

However, the first amended complaint alleged a longer time period of sexual abuse, including the fall of 2006 through the spring of 2009, when John Doe 4 was a "sixth, seventh and eighth grade student." In addition, the amended complaint contained, *inter alia*, repeated allegations that John Doe 4 was "sexually groomed, harassed, abused and sexually assaulted" by Hawkins on numerous occasions on Freeburg school district's premises. Similar to the original complaint, the amended complaint alleged that, as a "direct and/or proximate result" of the conduct of Parrish, Haege, and Meggs, John Doe 4 suffered:

"Severe and permanent physical bodily injury, sickness and/or disease resulting in, but not limited to, panic disorder and anxiety, night terrors resulting in uncontrolled urination, heart palpations, uncontrolled sweats, depressive disorder, sleep disturbance, suicidal ideations and tendencies of self-mutilation, auditory hallucinations, psychological distress, obsessive-compulsive tendencies, post-traumatic stress disorder of a childhood onset, and a limited capacity for emotional and sexual intimacy, and social and sexual dysfunction, and as a result thereof he has and will continue to experience:

a. Physical and mental pain and suffering;

b. Emotional distress;

c. Loss of a normal life;

d. Medical and counseling expenses; and

e. Lost wages."

¶ 27    On December 8, 2017, John Doe 4 filed a second amended complaint in the district court, which contained the same factual allegations as the first amended complaint but alleged only four of the previous nine counts, namely, (1) Title IX discrimination, (2) substantive due

14

process, (3) denial of constitutional liberty interests, and (4) negligent failure to control conduct of Hawkins.

¶ 28                              E. Denial of Coverage

¶ 29    On August 4, 2014, prior to the amended complaints in the Doe 4 action, Superintendent Diefenbach submitted a demand for coverage under the policy regarding the Doe 4 action. RSUI responded by sending a denial of coverage letter to Superintendent Diefenbach on August 29, 2014. In the letter, RSUI alleged that Freeburg was aware of multiple reports and allegations that Hawkins had sexually abused other Carl L. Barton Elementary School students, dating back to 1980. Accordingly, RSUI maintained that the Doe 4 complaint constituted a claim first made against Freeburg "prior to the inception of the policy" and, thus, did not "trigger the Insuring Agreements or RSUI's duty to defend." In particular, RSUI claimed that the Doe 4 action was nearly identical to the Doe 1 action, which was filed by the same law firm and alleged that Hawkins sexually abused a student and that several Freeburg school district officials were aware of similar sexual abuse allegations made against Hawkins.

¶ 30    Additionally, RSUI indicated that it had reserved the right to decline coverage under exclusion 8, section IV.10 (exclusion 10) and the two modifying endorsement pages, "Bodily Injury Exclusion" and "Sexual Abuse with EPL Carve Back." Lastly, RSUI reserved "any and all rights under the [p]olicy and available at law to deny coverage" that were not recited in the letter.

¶ 31                              F. The Present Litigation

¶ 32    On September 24, 2014, Freeburg filed a four-count complaint for declaratory and injunctive relief against RSUI and defendants, Country Mutual and John Doe 4, in the circuit court of St. Clair County. Freeburg attached several exhibits to the complaint, including a copy of the policy, the federal complaint filed in the Doe 4 action, and the August 29, 2014, denial of coverage

15

letter. In counts III and IV,[4] Freeburg sought both a declaration that RSUI had a duty, under the policy, to defend and indemnify Freeburg in the Doe 4 action and injunctive relief requiring RSUI to defend and indemnify Freeburg in the Doe 4 action. In the complaint, Freeburg summarized RSUI's reasons for denying coverage, as stated in its August 29, 2014, letter, and Freeburg's response to each stated reason.

¶ 33    Freeburg asserted that the Doe 4 action did not arise out of the same or related facts or circumstances as the previously filed Doe actions and, therefore, the Doe 4 action did not constitute a single claim under the policy. In support, Freeburg argued that the complaints required different defenses because "each complaint relates to different allegations of sexual harassment and sexual abuse against different minor male students at different time periods." In the alternative, Freeburg asserted that the policy's references to "the same or related facts, circumstances, situations, transaction or events, or the same or related series of facts, circumstances, situations, transactions or events" and what constitutes a "[s]ingle [c]laim" were ambiguous and vague. As such, Freeburg argued that the policy provisions should be interpreted against RSUI.

¶ 34    Additionally, contrary to RSUI's denial letter, Freeburg asserted that, under the policy, (1) exclusions 8 and 10 were inapplicable because the Doe 4 action was "an independent claim based on separate facts and allegations and [was] not based on the same or essentially same facts or allegations as any other claim or matter of previous litigation" and (2) the "Sexual Abuse with EPL Carve Back" exclusion was inapplicable because John Doe 4 had alleged acts of "sexual harassment," which were not referenced or excluded from coverage under that particular provision. Freeburg further asserted that the Doe 4 action was expressly covered under the policy because the

---

[4]We have omitted counts I and II of Freeburg's complaint because they pertain only to Country Mutual.

16

alleged wrongful acts constituted an "Employment Practices Wrongful Act, as amended by endorsement including but not limited to Third Party Discrimination, Third Party Sexual Harassment, and violations of Title IX."

¶ 35  On December 17, 2014, RSUI filed a motion to dismiss and supporting memorandum, pursuant to section 2-619 of the Code of Civil Procedure (735 ILCS 5/2-619 (West 2014)), seeking a dismissal of counts III and IV of Freeburg's September 14, 2014, complaint and a finding that RSUI did not have a duty to defend or indemnify Freeburg in the Doe 4 action. In the supporting memorandum, RSUI gave a detailed summary of the Doe 1, Doe 2, and Doe 3 actions. According to RSUI, all of the Doe actions, including the Doe 4 action, "allege substantially the same theories" and similar factual and sexual abuse allegations as violations of Title IX.

¶ 36  RSUI next asserted that the policy's insuring agreement, section I.C, provided coverage for claims against Freeburg school district that alleged a "wrongful act," regardless of when the wrongful act was alleged to have occurred, so long as the claim against Freeburg school district was first made during the policy period—July 1, 2013, to July 1, 2014. In addition, RSUI asserted that section V.B.3 provided that "claims based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events, shall be deemed to be a single claim." RSUI also noted that Freeburg school district obtained the policy on July 1, 2013, shortly before judgments were entered in the Doe 2 and Doe 3 actions. Under these circumstances, RSUI argued that all of the Doe actions constituted a single claim first made against Freeburg prior to the inception of the coverage period and, as such, was excluded from coverage.

¶ 37  On April 7, 2015, Freeburg filed a response to RSUI's motion to dismiss. Freeburg first argued that RSUI's motion to dismiss was inappropriate because RSUI was seeking "affirmative

17

relief." Freeburg also argued that RSUI's motion to dismiss was essentially a motion for summary judgment. Next, contrary to RSUI's assertion, Freeburg asserted that the Doe 4 action did not "arise out of the same or related facts or circumstances" as the earlier Doe actions. In support, Freeburg argued that Illinois courts, in viewing insurance policies, have not found the phrase "a single or related series of facts" applicable to multiple abuse allegations over a span of time, whether by a single victim or multiple victims. As such, Freeburg asserted that the Doe 4 action was, indeed, a claim first made against Freeburg during the policy's coverage period. In the alternative, Freeburg argued that the phrase "same or related," as stated in the policy, was subject to more than one reasonable interpretation and was, therefore, ambiguous. For that reason, Freeburg again argued that, under Illinois contract principles, "these limiting provisions" should be construed "liberally" in favor of coverage.

¶ 38    On June 18, 2015, Freeburg filed a motion for summary judgment and supporting memorandum, seeking a determination that (1) RSUI owed a duty to defend Freeburg in the Doe 4 action under the policy, (2) RSUI vexatiously breached its duty to defend Freeburg, and (3) RSUI owed a duty to indemnify Freeburg for any settlement or judgment stemming from the Doe 4 action. Freeburg also requested an award of damages stemming from RSUI's breach of contract, including costs, expenses, and attorney fees.

¶ 39    On August 25, 2015, the circuit court entered an order setting RSUI's motion to dismiss and Freeburg's motion for summary judgment for hearing on September 15, 2015. RSUI filed its reply to Freeburg's response to RSUI's motion to dismiss on September 8, 2015. In that reply, RSUI first asserted that Freeburg, in its April 7, 2015, response to the motion to dismiss, did not dispute that the Doe 4 action involved substantially similar facts as the other Doe actions. RSUI further asserted that the insuring agreements, sections I.B and I.C, were triggered by the Doe 4

18

action. Specifically, in the Doe 4 action, several Freeburg school district officials, all insured persons under section I.B, and Freeburg school district, as an insured organization under section I.C, were named as defendants. However, RSUI argued that the insuring agreements were limited to claims of "wrongful acts" against Freeburg, where the claims against Freeburg were first made during the policy period, and each of the Doe actions were "deemed a single claim for all purposes" under section V.B.3 of the policy. Consequently, RSUI asserted that the Doe 4 action was "related" to the first Doe action, which was first made against Freeburg in 2010, nearly three years before the coverage period began on July 1, 2013.

¶ 40 In addition, contrary to Freeburg's contention, RSUI argued that the policy term, "single claim," was the essential term that was clearly defined by the policy, rather than the undefined term, "same or related claims," as Freeburg argued. According to RSUI, due to the prior Doe actions stemming from the "same alleged failures to supervise Hawkins," the clear language of the policy consolidated all of the Doe actions into a single claim, as defined by the policy.

¶ 41 Lastly, because RSUI's motion to dismiss was still pending, and it had not yet filed an answer to Freeburg's declaratory judgment complaint, RSUI asserted that Freeburg's June 18, 2015, motion for summary judgment was premature. In support, RSUI claimed that, upon a denial of its motion to dismiss, it would need to "initiate written and oral discovery to investigate and challenge [Freeburg's] factual allegations and assertions concerning coverage for [the Doe 4 action] under the *** policy."

¶ 42 On September 15, 2015, the circuit court heard argument regarding RSUI's motion to dismiss. Following argument, the court took the motion under advisement and entered an order allowing Freeburg to amend its complaint to add Doe 4's first amended complaint, filed on March 26, 2015, as an exhibit.

19

¶ 43    On November 13, 2015, the circuit court (Judge Stephen R. Rice) entered an order denying RSUI's motion to dismiss, finding the policy overbroad and that "the concept of a single claim as well as what constitutes related claims under the policy is ambiguous." In particular, the court concluded that "the degree of connection required to trigger the *** policy exclusion is ambiguous when the policy uses extraordinarily broad language: 'based on arising out of, directly or indirectly resulting from, in consequence of, or in any way involving.' " (Emphasis omitted.) The court also concluded that the overly broad language in the policy resulted in ambiguity in "applying the exclusion to a particular set of claims." As a result, the court found that any connection between the prior Doe actions and the Doe 4 action was "too tangential to be considered an adequate connection to trigger the exclusion or limit on coverage." Lastly, the court strictly construed the policy's single claim provisions in favor of coverage, finding that RSUI had drafted the ambiguous policy language.

¶ 44    On November 25, 2015, RSUI filed its answer, affirmative defenses, and counterclaims to Freeburg's September 15, 2015, amended complaint. In its answer, RSUI mainly reasserted, as affirmative defenses, the various policy provisions relied upon in its motion to dismiss and supporting memorandum. However, RSUI also added an additional affirmative defense, affirmative defense six, which was based on the common law "known[-]loss doctrine." Specifically, RSUI asserted the following seven affirmative defenses: (1) "Claims First Made Prior To The Policy Period"; (2) "Sexual Abuse, Assault, Molestation and Child Abuse or Neglect Excluded"; (3) "Bodily Injury Excluded"; (4) "Previous Noticed Claims Excluded"; (5) "Prior & Pending Litigation Excluded"; (6) "Known Loss"; and (7) "Other Insurance." In support of affirmative defense six, RSUI asserted the following:

"The known[-]loss doctrine in Illinois serves to exclude claims that were known, or should have been known, to an insured when purchasing an insurance policy. Therefore, the known[-]loss doctrine renders any loss resulting from the Doe 4 [complaint] uninsurable under Illinois Law because [Freeburg was] aware of a substantial risk of claims before purchasing coverage under the *** [p]olicy. As a result, there is no coverage for the Doe 4 [complaint] under the *** [p]olicy."

In support, RSUI asserted that Freeburg, through various school officials, was aware that Hawkins had been accused of sexually abusing at least five other Carl L. Barton Elementary School students from the early 1980s through May 2009, with the last occurrence of alleged sexual abuse resulting in the Doe 4 action. Thus, RSUI asserted that the known-loss doctrine rendered any loss associated with the Doe 4 complaint uninsurable because Freeburg knew, or should have known, that there was a substantial risk that additional claims associated with Hawkins's sexual abuse of students would be brought against Freeburg.

¶ 45    In its answer, RSUI also brought a counterclaim for declaratory judgment against Freeburg, seeking a determination that RSUI had no duty to defend or indemnify Freeburg in the Doe 4 action. In support, RSUI reiterated its affirmative defenses but attached, as exhibits, copies of the individual complaints filed in the Doe 1, Doe 2, and Doe 3 actions. In addition to the complaints, RSUI asserted that opposing counsel in the Doe 4 action was quoted in an article in the Belleville News-Democrat saying that he "expected to file more [complaints] on behalf of the victims of [Hawkins] and Freeburg School District in the future." RSUI further asserted that Freeburg was aware of at least five other potential victims as of May 2009, well before the issuance of the policy, and Freeburg had entered settlements with at least two other victims after the issuance of the

21

policy. Based on the foregoing, RSUI alleged that Freeburg, before applying for coverage under the policy, "[was] aware of a significant risk that [it] would incur future losses."

¶ 46     On December 8, 2015, the circuit court heard argument on Freeburg's June 18, 2015, motion for summary judgment. Prior to the hearing on the merits, RSUI asserted that, after responding to Freeburg's summary judgment motion, it had filed additional pleadings and that additional discovery would be needed concerning possible coverage defenses. In response, Freeburg asserted that RSUI had not raised any new reasons in the additional pleadings to deny coverage and that the factual allegations in the Doe 4 action invoked coverage based on the plain reading of the policy. In support, Freeburg argued that RSUI's "single claim" defense had already been rejected by the court and that exclusions 8 and 10 were inapplicable.

¶ 47     Regarding the summary judgment motion, Freeburg asserted various policy provisions, when viewed together, demonstrated coverage under the policy. According to Freeburg, the modifying endorsement page, modifying section III definitions, titled "Third Party Coverage Including Title IX Wording," provided that "the insurer shall pay for loss arising out of or in connection with any claim made against any insured alleging, arising out of, based upon or attributable to any third party discrimination and/or third party sexual harassment." In addition, this same modifying endorsement page defined "third party" as "any person with whom an insured interacts" and third party sexual harassment as "unwelcome sexual advances, request for sexual favors or other verbal, visual or physical conduct of a sexual nature that is made by an insured to a third party." Next, Freeburg asserted that "wrongful act," as defined under section III.O, was amended to include violations of Title IX, and "Employment Practices Wrongful Act," definition F, was amended to include third party discrimination or sexual harassment, as defined in the policy in paragraphs B.2 and B.3. Lastly, the section IV "Carve Back provision" ("Sexual Abuse with

22

EPL Carve Back") exclusion, which excluded, *inter alia*, claims involving sexual abuse or assault, was not applicable to "any claim alleging an Employment Practices Wrongful Act." Based on these provisions, Freeburg contended that the "Employment Practices Wrongful Act" definition was expanded to include coverage for third party claims, such as the Doe 4 action, and established RSUI's duty to defend Freeburg in the Doe 4 action.

¶ 48    RSUI countered that John Doe 4 alleged sexual harassment by Hawkins, who was not a party to the Doe 4 action. Instead, John Doe 4 alleged that Freeburg had knowledge of the sexual abuse and failed to protect John Doe 4. For that reason, RSUI asserted that the "Sexual Abuse with EPL Carve Back" modifying exclusion page was not applicable to the Doe 4 action. Next, RSUI contended that the bodily injury exclusion (raised as affirmative defense three) provided an exclusion of coverage regarding John Doe 4's claims of injury, which included, *inter alia*, bodily injury, mental anguish, or emotional distress. RSUI also contended that its duty to defend and indemnify Freeburg in the Doe 4 action was nullified under the common law known-loss doctrine (raised as affirmative defense six), due to Freeburg's awareness of the previous Doe actions along with the knowledge that there was a substantial possibility that Freeburg would suffer additional loss. Lastly, RSUI renewed its argument that, prior to the circuit court deciding Freeburg's summary judgment motion, additional discovery would be needed to address the various affirmative defenses to coverage. At the close of the proceedings, the court took the motion under advisement and directed the parties to submit proposed orders outlining the relevant case law within 15 days. The next status hearing was set on January 26, 2016.

¶ 49    Following the January 26, 2016, status hearing, the circuit court held additional status hearings primarily addressing issues related to discovery. The court also directed the parties to each submit a memorandum concerning the common law known-loss doctrine. On August 18,

23

2016, RSUI submitted its memorandum in support of the known-loss doctrine as an affirmative defense. John Doe 4's submission was on September 9, 2016, which was later joined by Freeburg on October 17, 2016.

¶ 50    On November 29, 2016, the circuit court (Judge Rice) entered an order striking RSUI's affirmative defense six. The court stated that RSUI wrote the policy with claims made clauses without reference to the common law known-loss doctrine and no basis existed for the court "to go beyond the 'four corners' of the policy to add a 'new' provision." In addition, relying on a Connecticut Supreme Court decision, *Travelers Casualty & Surety Co. of America v. Netherlands Insurance Co.*, 95 A.3d 1031 (Conn. 2014), the court found that RSUI failed to assert facts to demonstrate that "the insureds" had anything more than a mere suspicion that Hawkins had committed "improper acts" or that there may be other victims. Specifically, the court ruled that "[e]ven with the filing of suits by the previous John Does, there would be no more than a suspicion that anyone had an actual loss." After striking RSUI's affirmative defense six, the court ordered the parties to respond to RSUI's discovery requests concerning exclusions 8 and 10. The court subsequently ordered Freeburg to submit all requested documents for an *in camera* inspection.

¶ 51    On March 21, 2017, a case management conference was held. The circuit court, agreeing with Freeburg, found that exclusion 8 was limited to notice to prior insurance carriers of a claim.

¶ 52    Between April 18, 2017, and July 25, 2017, the circuit court held numerous status hearings and, again, resolved several ongoing discovery matters. The next status hearing was set for August 29, 2017.

¶ 53    On August 18, 2017, the circuit court (Judge Rice) entered an order partially granting Freeburg's June 18, 2015, summary judgment motion. Specifically, the court found that RSUI had a duty to defend Freeburg in the Doe 4 action but reserved ruling on whether RSUI had a duty to

24

indemnify Freeburg. In doing so, the court reaffirmed its (1) November 13, 2015, decision to deny RSUI's motion to dismiss based on its determination that the language of section V.B.3 of the policy was ambiguous and (2) November 29, 2016, decision to strike RSUI's affirmative defense based on the common law known-loss doctrine based on its finding that the known-loss doctrine was inapplicable. In addition, the court reviewed exclusions 8 and 10 and found, similar to section V.B.3, that the language of these two exclusions was overly broad and open to multiple interpretations and was, thus, ambiguous. Similar to section V.B.3., the court, once again, strictly construed exclusions 8 and 10 in favor of coverage.

¶ 54    Next, the circuit court considered RSUI's denial of coverage based on the modifying endorsement pages pertaining to section IV exclusions, titled "AMENDED BODILY INJURY AND PROPERTY DAMAGE" and "Sexual Abuse with EPL Carve Back." The court considered these two exclusions in the context of the policy's definitions of "The Employment Practices Wrongful Act," section III.F, and "Third Party Sexual Harassment," section III.B.3, as added to section III by the modifying endorsement page, "Third Party Coverage Including Title IX Wording." Specifically, the court stated:

> "[T]he Employment Practices Wrongful Act Clause is expressly modified by the Title IX endorsement page. The inclusion of the 'Third Party Sexual Harassment' clause modifies the bodily injury exclusion as to Title IX claims. Similarly, 'Third Party Sexual Harassment' clause modifies the 'Sexual Abuse With EPL Carve Back' clause, as 'C Section III' *** modifies the Employment Practices Wrongful Act clause to include any *actual or alleged Third Party Discrimination or Third Party Sexual Harassment.* Together the clauses extend coverage, at a minimum, to the Title IX count in [John Doe 4's] Amended Complaint against the [p]laintiff. If the clauses did not extend coverage

25

expressly, the Court would find that the clauses would be ambiguous. Such ambiguity would still require the Court to find that RSUI has the duty to defend [p]laintiff in the underlying suit." (Emphasis in original.)

In view of the foregoing, the court expressed that there were "no issues of fact, only issues of law."

¶ 55　On August 22, 2017, RSUI filed a motion pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), requesting that the circuit court make a special finding that there was no just reason for delaying the appeal of the court's orders, dated November 13, 2015, November 29, 2016, March 21, 2017, and August 18, 2017.

¶ 56　On August 29, 2017, before the start of the scheduled status hearing, Freeburg filed a response in opposition to RSUI's August 22, 2017, motion for a Rule 304(a) finding. After hearing arguments from all parties, the circuit court (Judge Rice) denied RSUI's motion, reasoning that an appeal would add unnecessary cost and delay to the pending litigation.

¶ 57　On September 26, 2017, RSUI filed a motion for summary judgment, asserting that the district court had granted partial summary judgment in the Doe 4 action on September 1, 2017. Based on the district court's factual findings, RSUI asserted that it could establish, as a matter of law, that it had no duty to defend or indemnify Freeburg in the Doe 4 action and, therefore, was titled to summary judgment. In support, RSUI attached a copy of the district court's summary judgment memorandum and order, which found that Freeburg school officials had violated Title IX as alleged in the Doe 4 complaint. The district court's order stated:

"[T]here can be no doubt that school officials had actual knowledge of Hawkins's purported misconduct with minor male students well before anything happened to [John Doe 4]. There are at least five males who claim they informed school officials that they were sexually abused by Hawkins while they were students in the School District."

26

The district court concluded, as a matter of law, that Freeburg school officials acted with "deliberate indifference" to Hawkins's misconduct after discussing five prior reports of alleged sexual misconduct by Hawkins and failing to take action to prevent future abuse.

¶ 58    Relying on the district court's decision, RSUI argued that the Title IV violations, as alleged in the Doe 4 action, were based on "the same or related facts or circumstances" as the other Doe actions or the district court "could not or would not" have relied on them in concluding that Freeburg school officials had actual knowledge of Hawkins's sexual misconduct prior to John Doe 4's enrollment in Freeburg school district. In further support, RSUI asserted that all Doe actions contained the same claim of deliberate indifference against Freeburg, namely:

> " 'That the deliberate indifference demonstrated by the Freeburg school district despite multiple reports of teacher/counselor/administrator-on-student sexual grooming sexual harassment and sexual abuse, caused Doe ___ to suffer unwarranted[,] unwelcome[,] and uninvited sexual harassment and sexual abuse of a gross and predatory nature repeatedly from [2006 to 2009/1994-96/1991/2005 to 2008].' "

Based on the district court's findings and the similarities in each of the Doe complaints, RSUI, again, argued that the Doe 4 action did not constitute a claim first made against Freeburg during the policy period and, consequently, RSUI had no duty to defend and indemnify Freeburg in the Doe 4 action.

¶ 59    In addition, contrary to the circuit court's November 29, 2016, finding that the known-loss doctrine was inapplicable because "the insureds" had only mere suspicion of Hawkins's wrongdoing, RSUI argued that the district court's findings established, as a matter of law, that Freeburg had " 'actual knowledge of Hawkins' alleged misconduct and the risk he posed to male students' " no later than 2006. Thus, RSUI could demonstrate that Freeburg " 'knew or had reason

27

to know' of a substantial probability of a loss, that is enough to invoke the 'known loss' doctrine." (Emphasis omitted.) As such, RSUI argued that the Doe 4 action was not covered "as a matter of Illinois public policy."

¶ 60    Lastly, according to RSUI, the district court determined that Hawkins had engaged in sexual abuse, rather than sexual harassment, and that the Doe 4 action alleged claims of sexual abuse under Title IX. For that reason, RSUI contended that the circuit court erred in partially granting Freeburg's June 18, 2015, summary judgment motion based on an erroneous finding that the "Third Party Coverage Including Title IX Wording" endorsement page modified the "Amended Bodily Injury And Property Damage" and "Sexual Abuse with EPL Carve Back" clauses. In support, RSUI argued, contrary to the district court's finding, that the "Third Party Coverage Including Title IX Wording" endorsement page specifically modified the definition of "Wrongful Act," not "Employment Practices Wrongful Act." Because "Amended Bodily Injury And Property Damage" and "Sexual Abuse with EPL Carve Back" clauses only concerned employment practices wrongful acts, which, by definition, applied exclusively to sexual harassment claims—not sexual abuse claims—both exclusions applied to the Doe 4 action. In simpler terms, RSUI asserted that the Doe 4 action involved Title IX claims of sexual abuse, and not sexual harassment, as determined by the district court, and consequently, these two exclusionary provisions released RSUI of a duty to defend and indemnify Freeburg in the Doe 4 action.

¶ 61    On October 6, 2017, Freeburg filed a petition for declaratory judgment seeking an order requiring RSUI to reimburse Freeburg for the costs and fees incurred in the defense of the Doe 4 action. In support, Freeburg asserted that RSUI had refused to assume the costs of the defense in

28

the Doe 4 action, despite the circuit court's August 18, 2017, order finding that RSUI had a duty to defend Freeburg.

¶ 62 On October 24, 2017, the circuit court set RSUI's September 26, 2017, motion for summary judgment for hearing on January 16, 2018. The order did not address Freeburg's October 6, 2017, petition for declaratory judgment.

¶ 63 On January 8, 2018, Freeburg filed a motion for sanctions against RSUI, pursuant to Illinois Supreme Court Rule 219 (eff. July 1, 2002), asserting that RSUI made no effort to comply with the circuit court's August 18, 2017, summary judgment order, which instructed RSUI to defend Freeburg in the Doe 4 action. Freeburg further asserted that RSUI ignored all requests to tender a defense, acted in bad faith at the district court's pretrial settlement conference, and was "conspicuously absent" at the trial setting. Freeburg also asserted that, due to RSUI's failure to act in good faith, Freeburg had lost an opportunity to engage in meaningful settlement negotiations prior to the trial on the Doe 4 action on December 12, 2017, and, consequently, Freeburg incurred additional expenses associated with the trial. As a sanction, Freeburg requested the court to strike RSUI's pleadings and make a finding that RSUI was estopped from asserting any defenses against coverage.

¶ 64 On January 11, 2018, RSUI responded to Freeburg's motion for sanctions, arguing that Freeburg failed to establish that RSUI had engaged in sanctionable conduct. In support, RSUI asserted that the August 18, 2017, order finding RSUI had a duty to defend Freeburg was not a final, enforceable order due to the circuit court's August 29, 2017, order denying RSUI's motion for a Rule 304(a) finding. As such, the order was subject to reconsideration. Moreover, RSUI asserted that Freeburg had successfully opposed the October 24, 2017, hearing date for RSUI's motion for summary judgment, which requested the court reconsider its August 18, 2017, decision.

29

As a result of the delay, RSUI's motion for summary judgment was not heard prior to the trial on the Doe 4 action.

¶ 65    On January 16, 2018, the circuit court entered an order setting Freeburg's motion for sanctions on January 31, 2018. The court set all other pending motions for hearing on April 4, 2018.

¶ 66    On January 31, 2018, the circuit court held a hearing on Freeburg's motion for sanctions. Following the parties' arguments, the court reserved ruling and directed the parties to submit proposed orders by February 5, 2018. The matter was set for a conference call on February 8, 2018.

¶ 67    On February 7, 2018, the circuit court (Judge Stephen P. McGlynn) ruled that the August 17, 2017, order was final and appealable. Relying upon *Fremont Compensation Insurance Co. v. Ace-Chicago Great Dane Corp.*, 304 Ill. App. 3d 734 (1999), the court ruled that RSUI, by neither filing a notice of appeal nor asking the court to stay enforcement of the order, failed to preserve its claim. Thus, the court determined that the August 17, 2017, determination was binding and RSUI, "having breached its contract with [Freeburg school district], has a duty to indemnify [Freeburg] in the [Doe 4 complaint]."

¶ 68    On February 9, 2018, Freeburg filed a motion for clarification of the February 7, 2018, order. The circuit court subsequently entered an order documenting that it had conducted a telephonic status conference on February 8, 2018. The court noted that, due to multiple parties "wanting to argue or have clarification with respect to this Court's February 7, 2018, order," it would allow the parties until February 18, 2018, to file motions for "clarification or reconsideration." Shortly thereafter, the February 18, 2018, deadline was extended to February 21, 2018.

30

¶ 69    On March 9, 2018, RSUI filed a notice of appeal from the November 13, 2015, November 29, 2016, March 21, 2017, August 18, 2017, and February 7, 2018, orders. While the appeal was pending, Freeburg filed with this court a motion to dismiss the appeal pursuant to Illinois Supreme Court Rule 23(c)(1) (eff. Jan. 1, 2011), which alleged that the appeal was premature. In response, RSUI did not object to the dismissal of the appeal but argued that the circuit court had erred in finding that the August 18, 2017, order was appealable absent a Rule 304(a) finding. This court agreed and, consequently, in an unpublished summary order on July 26, 2018 (*Freeburg Community Consolidated School District No. 70 v. Country Mutual Insurance Co.*, No. 5-18-0159 (2018) (unpublished summary order under Illinois Supreme Court Rule 23(c)), granted Freeburg's motion to dismiss, dismissing the appeal for want of jurisdiction.

¶ 70    Prior to our dismissal order, the circuit court (Judge McGlynn) entered an order on June 19, 2018, which clarified the February 7, 2018, order. The court ruled that the August 18, 2017, order was not enforceable or appealable because Judge Rice did not make a Rule 304(a) finding. Because the order was not enforceable and Freeburg had not suffered prejudice, the court found no basis for sanctions and, thus, denied Freeburg's motion for sanctions. In addition, the court stayed the August 18, 2017, order pending a resolution of RSUI's September 26, 2017, motion for summary judgment and until further order of the court. Lastly, the court set RSUI's motion for summary judgment for hearing on August 16, 2018, which was subsequently continued to August 30, 2018.

¶ 71    On August 3, 2018, Freeburg filed a 50-page cross-motion for summary judgment, a memorandum in support, and a response to RSUI's motion for summary judgment. In support of the motion for summary judgment, Freeburg asserted that, due to the plain language of the policy, Doe 4's Title IX claim, which was the subject of the district court's summary judgment order, was

31

covered under the "Employment Practices Wrongful Act" provision of the policy. Freeburg also renewed its previous argument for sanctions against RSUI based on its failure to defend Freeburg in the Doe 4 action and further asserted that RSUI should be estopped from denying coverage because it had breached its court-ordered duty to defend Freeburg.

¶ 72   In response to RSUI's motion for summary judgment, Freeburg asserted that the arguments raised by RSUI were previously briefed, argued, and determined by the circuit court to be inapplicable to the coverage dispute. In particular, Freeburg asserted that (1) RSUI had simply masked its previous single claim argument as a "related claim"; (2) RSUI had, again, erroneously asserted that there was no duty to indemnify Doe 4's Title IX claim because these claims alleged sexual abuse, not sexual harassment, and, hence, were not included in the "Employment Practices Wrongful Acts" provisions of the policy; and (3) the district court's summary judgment order did not change the court's previous determination that the known-loss doctrine was inapplicable when John Doe 4 was an unknown and unidentified victim prior to his filing of the Doe 4 complaint during the coverage period.

¶ 73   On October 31, 2018, the circuit court (Judge Julie K. Katz) entered an order granting Freeburg's cross-motion for summary judgment, finding that RSUI had a duty to indemnify Freeburg regarding a settlement agreement entered by the district court in the Doe 4 action.

¶ 74   On February 13, 2019, the circuit court (Judge Katz) entered an order assessing the amount RSUI owed Freeburg for the costs associated with the settlement agreement and determined that there was no just reason for delaying either enforcement or appeal of the court's previous orders pursuant to Rule 304(a).

¶ 75    On March 7, 2019, RSUI filed a notice of appeal, challenging the November 13, 2015, November 29, 2016, March 21, 2017, and August 18, 2017, orders entered by Judge Rice and the October 31, 2018, and February 13, 2019, orders entered by Judge Katz.

¶ 76                                II. Analysis

¶ 77    On appeal, RSUI first contends that the circuit court erred in denying its section 2-619 motion to dismiss. Specifically, RSUI argues that the court erred in finding the policy's related-claim provision ambiguous and that the Doe 4 action was a claim first made against Freeburg during the coverage period.

¶ 78                          A. Standard of Review

¶ 79    A circuit court's ruling on a section 2-619 motion to dismiss presents a question of law, and thus, our review is *de novo. Czarobski v. Lata*, 227 Ill. 2d 364, 369 (2008). Likewise, a circuit court "striking an affirmative defense as inadequate as a matter of law is subject to *de novo* review." *Hartmann Realtors v. Biffar*, 2014 IL App (5th) 130543, ¶ 20. Lastly, we apply a *de novo* review to a court's ruling on the construction, interpretation, or legal effect of a contract. *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 129 (2005).

¶ 80    Where, as here, the issues are all reviewed *de novo*, " 'we perform the same analysis a trial court would perform and give no deference to the judge's conclusions or specific rationale.' " *Hassebrock v. Ceja Corp.*, 2015 IL App (5th) 140037, ¶ 79 (quoting *Bituminous Casualty Corp. v. Iles*, 2013 IL App (5th) 120485, ¶ 19). "The term '*de novo*' means that the court reviews the matter anew—the same as if the case had not been heard before and as if no decision had been rendered previously." *Ryan v. Yarbrough*, 355 Ill. App. 3d 342, 346 (2005). Thus, if we find the circuit court's determination erroneous as to a question of law, we may substitute our

determination for that of the circuit court. *People ex rel. Garnati v. $14,000 United States Currency*, 227 Ill. App. 3d 64, 66 (1992).

¶ 81 Keeping with our *de novo* standard of review, we now turn to the circuit court's denial of RSUI's December 17, 2014, motion to dismiss Freeburg's complaint for declaratory judgment.

¶ 82                     B. Denial of RSUI's Motion to Dismiss

¶ 83 "A section 2-619 motion to dismiss admits the sufficiency of the complaint, but asserts a defense outside the complaint that defeats it." *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 31. Section 2-619 "allows for an involuntary dismissal of a claim based on certain defects or defenses." *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 485 (1994). " '[A]ffirmative matter,' in a section 2-619(a)(9) motion, is something in the nature of a defense which negates the cause of action completely or refutes crucial conclusions of law or conclusions of material fact contained in or inferred from the complaint." *Id.* at 486 (citing *John v. Tribune Co.*, 24 Ill. 2d 437 (1962)). A section 2-619 motion to dismiss can essentially amount to a summary judgment procedure under circumstances, such as those in the case before us, where the motion refutes a conclusion of material fact unsupported by specific facts contained in or inferred from the complaint. *Palmisano v. Connell*, 179 Ill. App. 3d 1089, 1097 (1989). "If a critical issue of material fact is refuted by an affirmative matter, a motion made pursuant to section 2-619(a)(9) may be granted." *Id.*

¶ 84                1. Consideration of Extrinsic Evidence—Doe Complaints

¶ 85 As a preliminary matter we address RSUI's argument that it properly considered extrinsic evidence in denying coverage and in relying on extrinsic evidence in support of its motion to dismiss. RSUI also maintains that this court may properly consider extrinsic evidence in conducting our *de novo* review because our consideration of extrinsic evidence would not

34

determine an issue critical to the outcome of the underlying claim. In its reply brief, Freeburg does not address whether this court could properly rely on extrinsic evidence but, instead, argues that RSUI "inappropriately considered outside evidence" in denying coverage. We agree with RSUI and will consider extrinsic evidence, including the Doe complaints, in rendering our decision.

¶ 86 A circuit court should generally apply an "eight corners rule" in determining whether an insurer has a duty to defend its insured in a lawsuit. *Pekin Insurance Co. v. Dial*, 355 Ill. App. 3d 516, 519 (2005). That is to say, the circuit court "should compare the four corners of the underlying tort complaint with the four corners of the insurance policy and determine whether the facts alleged in the underlying complaint fall within, or potentially within, the insurance policy's coverage." *Id.* Under certain circumstances, however, "a circuit court may *** look beyond the underlying complaint in order to determine an insurer's duty to defend." *Pekin Insurance Co. v. Wilson*, 237 Ill. 2d 446, 459 (2010). The only time that an insurer should not be permitted to offer extrinsic evidence to prove that an exclusion applies is " '*when it tends to determine an issue crucial to the determination of the underlying lawsuit.*' " (Emphasis added.) *Id.* at 461 (quoting *Fidelity & Casualty Co. of New York v. Envirodyne Engineers, Inc.*, 122 Ill. App. 3d 301, 304-05 (1983)). Moreover, if a crucial issue will not be determined, no reason exists to deny the party seeking a declaration of rights the prerogative to present evidence that is accorded generally to a party during a motion for summary judgment in a declaratory proceeding. *Fidelity & Casualty Co. of New York*, 122 Ill. App. 3d at 305. In other words, "the eight-corners rule bars extrinsic evidence only if, as a result of the proposed declaratory judgment, the plaintiff in the underlying lawsuit could be hampered by collateral estoppel." *Pekin Insurance Co. v. St. Paul Lutheran Church*, 2016 IL App (4th) 150966, ¶ 64. Considering these principles, we address whether pertinent facts outside of the

"eight corners" of the underlying pleadings and applicable policy might determine an issue crucial to the determination of the Doe 4 action.

¶ 87 Here, we find that there is no concern that such issue might be determined. Unlike the Doe 4 action, the parties agree that the prior Doe actions are not included in the coverage period under the policy. Furthermore, a monetary judgment against Freeburg was entered in the Doe 4 action prior to this appeal. Therefore, we fail to see any possible harm to Freeburg in our consideration of the complaints filed in the prior Doe actions in determining whether the complaint filed in the Doe 4 action triggered RSUI's duty to defend under the policy. We also note that the circuit court apparently reached a similar conclusion in its November 13, 2015, order denying RSUI's motion to dismiss. Specifically, the court considered the previously filed Doe complaints in finding that "any connection between the Doe [complaints] and the underlying Doe 4 complaint is too tangential to be considered an adequate connection to trigger this [single claim] exclusion or limitation on coverage."

¶ 88 Freeburg argues, in the alternative, that it was inappropriate for RSUI to consider extrinsic evidence in denying coverage because RSUI "ignored their own failings in the underwriting process" and should have discovered the prior Doe actions before issuing the policy. In support, Freeburg relies on *Triple-X Chemical Laboratories v. Great American Insurance Co.*, 54 Ill. App. 3d 676 (1977), which we find distinguishable.

¶ 89 In *Triple-X Chemical Laboratories* (*id.* at 679), the First District construed an increase in hazard provision under an insurance policy. Great American Insurance Company (Great American) denied coverage to Triple-X Laboratories (Triple-X) on its claim for losses resulting from a fire, which occurred several weeks after an earlier fire. *Id.* at 677-78. Following a fire on August 18, 1972, the fire marshal informed Triple-X that it was in violation of the fire code because

36

all of its electric motors were not of the explosion-proof (totally encased) type. *Id.* at 679. The fire marshal ordered compliance within 30 days. *Id.* On September 7, 1972, a second fire occurred, which Great American concluded resulted from Triple-X's continued use of non-explosion proof machines to fill containers with stove polish, a flammable substance. *Id.* at 678.

¶ 90 Great American settled claims from the first fire but asserted affirmative defenses to Triple-X's claim arising out of the second fire, asserting that Triple-X increased the hazard and neglected to use all reasonable means to save and preserve the property after the loss. *Id.* at 678-79. The First District concluded that, even accepting the defendant's allegations as true,

"they do not substantiate defendant's defense of increase of hazard. In the absence of fraud or deceit \*\*\*, an insurer is deemed to insure against the risks inherent in the business of the insured at the time the policy is issued. [Citation.] In determining the nature and extent of the risks insured against, the insurer is bound by what it knows or should have known concerning *the normal and customary hazards inherent in the insured's business.* [Citations.] If the insurer does not intend to insure against a risk which is necessarily incident to the business of the insured, it should specifically *exclude such risk* from the coverage of the policy. [Citation.]" (Emphases added.) *Id.* at 679.

¶ 91 Where "approximately 20 percent of [Triple-X's] business consisted of mixing, manufacturing and packaging of flammable substances" (*id.*), there existed "no factual dispute as to the nature of [the] plaintiff's operations at the time the policy was issued and that these operations involved non-explosion-proof machines and flammable substances." *Id.* at 681. In other words, Great American had actual knowledge of the "normal and customary" hazards inherent in Triple-X's business. *Id.* at 679. Here, unlike *Triple X*, Freeburg's business consisted of operating a school district. We do not believe it is reasonable to argue that RSUI knew or should have known

37

that a *normal and customary hazard* inherent in operating a school district was the failure of school officials to take appropriate action to protect its students from ongoing sexual abuse following accusations that a sexual predator, employed in the district, had sexually abused a number of minor male students while on school premises. Furthermore, as emphasized in *Triple-X* (*id.* at 679), here, RSUI "excluded such risk from the coverage of the policy," unless applicable to an "Employment Practices Wrongful Act." In particular, the policy excludes coverage of "any Loss in connection with any Claim *** made against any Insured alleging, arising out of, based upon or attributable to, or in any way involving any sexual abuse or sexual assault, molestation, child abuse or neglect; provided that this exclusion shall not apply to any Claim alleging an Employment Practices Wrongful Act." Accordingly, we find Freeburg's reliance on *Triple-X* misplaced.

¶ 92    Based on the foregoing, we find nothing inappropriate in RSUI's consideration of extrinsic evidence in denying coverage under the policy, and we find no error in the circuit court's apparent consideration of extrinsic evidence in ruling on the motion to dismiss. Furthermore, consistent with these findings, we will also consider extrinsic evidence in our *de novo* review of the court's decision to deny RSUI's motion to dismiss.

¶ 93                    2. Single Claims Provision

¶ 94    We now turn to whether the language of the single claims provision is ambiguous. In ruling on RSUI's motion to dismiss, the circuit court concluded that the "overly broad language" used in the "single [c]laim or related claims" provision resulted in ambiguity "in both determining the degree of connection required to trigger the exclusion and applying the exclusion to a particular set of claims." While RSUI concedes that the language in the single claims provision is broad, it maintains that the provision is unambiguous. RSUI asserts that the Doe 4 action was logically connected to the previously filed Doe actions, rendering all Doe actions, including the Doe 4

38

action, a single claim first made against Freeburg when the Doe 1 action was filed in July 2010. In response, consistent with the court's ruling, Freeburg asserts that the policy's references to "related claims" is undefined and, accordingly, ambiguous. We agree with RSUI and find the court erred in finding the language of the single claims provision ambiguous.

¶ 95    Under Illinois law, an insurer's duty to defend its insured arises when the factual allegations of the claim against the insured potentially fall within coverage. *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 398 (1993). Whereas the duty to indemnify is much narrower and arises only when the factual allegations of the claim actually fall within coverage. *Id.* Thus, "where there is no duty to defend, there will be no duty to indemnify." *Id.*

¶ 96    The present dispute involves a "claims-made" insurance policy as compared to an occurrence policy. "The major difference between a claims made policy and an occurrence policy is in the risk insured." *General Insurance Co. of America v. Robert B. McManus, Inc.*, 272 Ill. App. 3d 510, 514 (1995). In an occurrence policy, the insurance company is exposed to indefinite future liability for negligent or other liability-causing acts or omissions occurring during the policy period. *National Union Fire Insurance Co. of Pittsburgh v. Baker & McKenzie*, 997 F.2d 305, 306 (7th Cir. 1993). In other words, the risk is the occurrence itself. *General Insurance Co. of America*, 272 Ill. App. 3d at 514. In contrast, claims-made policies limit coverage to claims made during the coverage period, and therefore, "the risk insured is the claim brought by third parties against the insured." *Id.* "A typical claims-made policy covers acts and omissions occurring either before or during the policy period; for prior acts, the policy may provide full retroactive coverage[,] or it may only cover claims arising out of acts and omissions after the retroactive date specified in the declarations." (Internal quotation marks omitted.) *Medical Protective Co. v. Kim*, 507 F.3d 1076, 1082 (7th Cir. 2007).

39

¶ 97    When construing the language of an insurance policy, a court's primary objective is to determine and effectuate the parties' intentions as expressed in their written agreement. *Pekin Insurance Co.*, 237 Ill. 2d at 455. "The words of a policy should be accorded their plain and ordinary meaning," or their meaning as defined within the policy, if applicable. *Nicor, Inc. v. Associated Electric & Gas Insurance Services Ltd.*, 223 Ill. 2d 407, 416 (2006). "The policy must be construed as a whole, giving effect to every provision." *West American Insurance Co. v. Yorkville National Bank*, 238 Ill. 2d 177, 184 (2010). The type of insurance provided as well as the nature of the risks involved should also be taken into account. *Nicor*, 223 Ill. 2d at 416.

¶ 98    When the words of a policy "are reasonably susceptible to more than one meaning, they are considered ambiguous." *Rich v. Principal Life Insurance Co.*, 226 Ill. 2d 359, 371 (2007). If an ambiguity is found in the policy, it will be strictly construed against the insurer who drafted the policy, especially if the ambiguity attempts to exclude or limit coverage. *Id.* at 379. However, a policy provision will not be rendered ambiguous simply because the parties disagree on its meaning. *Founders Insurance Co. v. Munoz*, 237 Ill. 2d 424, 433 (2010). Nor is a provision considered ambiguous if the policy fails to specifically define a term or "because the parties can suggest creative possibilities for its meaning." *Nicor*, 223 Ill. 2d at 417. "Reasonableness is the key, and the touchstone is whether the provision is subject to more than one reasonable interpretation, not whether creative possibilities can be suggested." *Johnson v. Davis*, 377 Ill. App. 3d 602, 607 (2007). In other words, we consider only reasonable interpretations of the policy language and "will not strain to find an ambiguity where none exists." *Rich*, 226 Ill. 2d at 372.

¶ 99    Here, under the policy, it is undisputed that RSUI had a duty to defend and indemnify against a claim first made against Freeburg during the policy period. The policy provides an

unquestionably clear definition of the term "Claim" in section III.B, which provides, in pertinent part, that a "Claim, either in the singular or the plural," means:

"4. A civil, criminal, administrative, regulatory or arbitration proceeding for monetary or non-monetary relief which is commenced by:

a. Service of a complaint or similar pleading."

Subsection 4.a is of particular importance because it brings civil proceedings for monetary relief within the definition of a "Claim." The prior Doe actions and the Doe 4 action all involve civil proceedings seeking monetary relief that commenced by a complaint served on Freeburg. In view of this, there is no question that the Doe 4 action constitutes a "[c]laim" within the plain meaning of this provision.

¶ 100  We now turn to the determinative issue—whether the Doe actions, collectively, fall within policy's definition of a single claim. Thus, we must construe section V.B.3 of the policy, which states:

"3. All *Claims* based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transaction or events, or the same or related series of facts, circumstances, situations, transactions or events shall be deemed to be a single *Claim* for all purposes under this policy *** and shall be deemed first made when the earliest of such *Claims* is first made, regardless of whether such date is before or during the *Policy Period*." (Emphases in original.)

A plain, ordinary reading of section V.B.3 would lead a reasonable person to conclude that the Doe 4 action reasonably falls under this provision because it "directly *** resulted from *** the same or related series of facts circumstances, situations, transactions or events" as the prior Doe

41

actions. We find no ambiguity created in this case from the use of broad language in defining "single [c]laim" under the circumstances presented here. See *Doe v. Illinois State Medical Inter-Insurance Exchange*, 234 Ill. App. 3d 129, 137 (1992) ("In determining whether there is an ambiguity, the clause must be read within its factual context.").

¶ 101   In support of its contention that the single claims provision is ambiguous, Freeburg argues that RSUI failed to include a definition of the term "related" in the policy. Freeburg also argues that the prior Doe actions were based on different events requiring different defenses. We note, however, that all prior Doe actions were brought on behalf of minor male students alleging sexual abuse by Hawkins while attending the Carl L. Barton Elementary School. In addition, the grounds for monetary relief remain the same, specifically, the same pattern of neglect by the same Freeburg school district officials, Parrish, Haege, and Meggs, who acted with deliberate indifference to the multiple reports alleging that Hawkins had been engaging in sexual grooming, sexual harassment, and sexual abuse of students. Furthermore, according to the complaints filed in the prior Doe actions, the Doe plaintiffs, as a result of the alleged deliberate indifference of Freeburg school officials, suffered the same type of harm—repeated sexual abuse by Hawkins—while on the premises of the Carl L. Barton Elementary School during specified times. Accordingly, the overriding common event among the Doe actions is the causal connection of the alleged misconduct of Freeburg school district officials, specifically, Parrish, Haege, and Meggs, in failing to take action to protect students from a reported sexual predator employed by Freeburg school district, which, in effect, allowed the repeated sexual victimization of the Doe plaintiffs. Therefore, unlike the clearly defined term "claim," even in the absence of a definition for the term "related" in the policy, we find that the Doe 4 action is sufficiently connected to the prior Doe actions to

42

establish that, under the policy, it was a claim related to the Doe 1 action, which was filed in July 2010, prior to the policy coverage period.

¶ 102   Claims that involve the same, continuing course of misconduct by the same school officials that culminates in the same type of harm from a common, identified sexual predator, while that predator was an employee of the Freeburg school district is a "related series of facts, circumstances, situations, transactions or events" under any ordinary meaning of the phrase. This is especially true in the context of a claims-made policy, where the triggering event is the filing and service of a complaint, rather than the occurrence date of the alleged misconduct. As noted above, "[i]n determining whether there is an ambiguity, the clause must be read within its factual context" (*Doe*, 234 Ill. App. 3d at 137), and this court "will not strain to find an ambiguity where none exists." *Rich*, 226 Ill. 2d at 372.

¶ 103   We further note that our " 'primary objective in construing the language of the policy is to ascertain and give effect to the intentions of the parties as expressed in their agreement.' " *Pekin Insurance Co.*, 237 Ill. 2d at 455 (quoting *American States Insurance Co. v. Koloms*, 177 Ill. 2d 473, 479 (1997)). "A court must construe the policy as a whole and take into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract." *Koloms*, 177 Ill. 2d at 479. Here, Freeburg's policy contained modifications to and exclusions from RSUI's standard policy that are relevant in determining both the parties' intent and policy purpose. Notably, RSUI's standard policy was modified to exclude coverage for claims "alleging, arising out of, based upon or attributable to, or any way involving sexual abuse or sexual assault, molestation, child abuse or neglect" except in narrowly defined circumstances. Freeburg's policy also contained an exclusion related to prior or pending litigation, as well as the facts or circumstances underlying or alleged in such prior or pending litigation. We find, based on review

43

of these exclusions in conjunction with the remaining policy language, that the parties never intended, nor was it the policy's purpose, to provide coverage for a claim such as that brought in the Doe 4 claim. In our judgment, to construe the single claim provision in the manner urged by Freeburg, would expand policy coverage beyond the actual policy language and undermine the contractual intention of the parties. We, therefore, decline to construe the single claims provision in such fashion.

¶ 104   Based on the foregoing, we find the circuit court erred in determining that the policy's limit of liability provision pertaining to the single claims provision, section V.B.3, was ambiguous, and that the Doe 4 action was a claim first made against Freeburg during the coverage period. Accordingly, we conclude that the circuit court erred in denying RSUI's motion to dismiss. As this conclusion terminates the present litigation on remand, we decline to address the remaining issues raised by the parties on appeal as they are neither essential to the disposition of this case nor will the result be affected regardless of how the issues are decided. *Condon v. American Telephone & Telegraph Co.*, 136 Ill. 2d 95, 99 (1990).

¶ 105                          III. Conclusion

¶ 106   Based on the foregoing, we reverse the judgment of the circuit court entered on November 13, 2015, denying RSUI's motion to dismiss. We vacate the orders entered thereafter and remand this matter to the court with directions to enter an order dismissing with prejudice counts III and IV of Freeburg's September 15, 2015, amended complaint for declaratory judgment.


¶ 107   Reversed in part and vacated in part; cause remanded with directions.

**No. 5-19-0098**

| | |
|---|---|
| **Cite as:** | *Freeburg Community Consolidated School District No. 70 v. Country Mutual Insurance Co.*, 2021 IL App (5th) 190098 |
| **Decision Under Review:** | Appeal from the Circuit Court of St. Clair County, No. 14-MR-384; the Hon. Stephen R. Rice and the Hon. Julie K. Katz, Judges, presiding. |
| **Attorneys for Appellant:** | Neil E. Holmen and Cassandra L. Jones, of Walker Wilcox Matousek LLP, of Chicago, for appellant. |
| **Attorney for Appellee:** | Thomas R. Kelley, LLC, of Belleville, for appellees. |